117 P.3d 1182 (2005)
STATE of Washington, Respondent,
v.
Allen Ray JACKSON, Appellant.
No. 30980-7-II.
Court of Appeals of Washington, Division Two.
August 16, 2005.
*1183 Kelli Ellen Osler, Clark County Prosecutors Ofc., Vancouver, WA, for Respondent.
Lisa Elizabeth Tabbut, Attorney at Law, Longview, WA, for Appellant.

PART PUBLISHED OPINION
QUINN-BRINTNALL, C.J.
¶ 1 The State charged Allen Ray Jackson with first degree assault,[1] Count I, and first degree burglary,[2] Count II, each with a firearm enhancement.[3] The jury found him guilty of both counts, with firearm enhancements. The trial court calculated Jackson's offender score as "8" for the assault, with a standard range of 209 to 277 months, and "10" for the burglary, with a standard range of 87 to 116 months. The court sentenced Jackson to 228 months for the assault and 116 months for the burglary, to run concurrently. It also imposed 120 months for the two firearm enhancements, to run consecutively,[4] *1184 for a total standard range sentence of 348 months.
¶ 2 Jackson appeals his convictions, contending that (1) he was denied a fair trial when the prosecutor committed misconduct by questioning a witness about the results of Jackson's former co-defendant's separate trial; and (2) the evidence of his intent to cause great bodily harm is insufficient to support his first degree assault conviction. In his Statement of Additional Grounds for Review (SAG),[5] Jackson asserts that the trial court improperly excluded testimony regarding the victim's use of methamphetamine (1) at the time of the alleged assault and (2) when the victim spoke with police.[6]
¶ 3 Jackson also appeals his sentence, contending that the trial court failed to classify and, therefore, improperly included in his offender score an Oregon conviction for unauthorized use of a motor vehicle.
¶ 4 Because the elements of the Washington and Oregon crimes are not identical, we cannot determine on the record before us whether Jackson's Oregon conviction is equivalent to a Washington felony and properly included in his offender score. Thus, we vacate Jackson's sentence and remand for a hearing on the matter and, if necessary, resentencing. But we affirm Jackson's convictions in all other respects.

FACTS
¶ 5 On the afternoon of March 13, 2003, Robert Pratt was at his Vancouver, Clark County home talking to a friend on the phone when he heard a knock at the door. Through his window, he saw Michael Hale and another man he did not know. Pratt knew Hale as the former boyfriend of Pratt's girlfriend, April. Although Pratt had not seen Hale since October or November 2002, he thought Hale might be angry with him about April.
¶ 6 When Pratt opened the front door, Jackson, the man with Hale, asked Pratt if he was the Robert that did cell phones.[7] Pratt said no. When Jackson continued to question him, Pratt ended his phone call and asked Jackson, "Now, what is this about?" 3 Report of Proceedings (RP) at 99. Jackson seemed very angry. But when Jackson turned and asked Hale "[i]s this the Robert," Pratt became confused  he had assumed the men had come because of Pratt's relationship with April. 3 RP at 101.
¶ 7 Jackson then asked Pratt if he knew someone named Amber. When Pratt asked Jackson if he meant Amber Jobe or Amber Hamrick, Jackson pulled out a gun and pointed it at Pratt's face. Hale touched Jackson on the shoulder and said, "Let's go." 3 RP at 103. But Jackson moved forward into the house through the open front door, still pointing the gun at Pratt's head.
¶ 8 Pratt asked Jackson to take the gun out of his face. Sensing it was unwise to retreat further into the house, Pratt tried to stand his ground, but he was scared that Jackson would pull the trigger. Jackson continued to move into the house and Pratt pushed the gun away from his face a few times. Then, remembering that his roommate was home, Pratt yelled to his roommate to call the police.
¶ 9 Pratt and Jackson collided and both fell to the floor. Jackson pinned Pratt to the ground with his knee and moved the gun toward Pratt's forehead. As Pratt pushed at Jackson's arm, the gun went off. Pratt screamed and, after a moment of blackness, *1185 he got up and told Jackson, "Get the fuck out of my house." 3 RP at 112. As Jackson was leaving, he threatened Pratt that he would come back for him. Pratt, unaware that he had been shot, ran out of the house and then realized that the back of his head was bleeding. He saw a metallic blue pickup truck with a canopy drive away but was unable to see the license plate.
¶ 10 Carol Stroup, Pratt's neighbor across the street, testified that she heard a gunshot and looked out of her window. She saw a man run across the street and get into the passenger side of a royal blue pickup without a canopy. At Jackson's trial, Stroup testified that Jackson "look[ed] like the person" she saw running from Pratt's house. 3 RP at 301.
¶ 11 When the police arrived at Pratt's home, he was sitting on the front steps bleeding from the back of his head. Pratt was transported by ambulance to Emanuel Hospital in Portland, where he received two staples to close his wound. Dr. William Long, the emergency room physician who treated Pratt, testified that the approximately one-inch laceration on the back of Pratt's head could have come from a bullet, although he was not certain.
¶ 12 Detective Jane Scott of the Vancouver Police Department investigated the scene of the incident. She found an area rug with a hole in it. The hole in the rug corresponded with a hole in Pratt's hardwood floor, suggesting that a bullet might have passed through the floor and sub-floor to the crawl space under the house. But the police were never able to find a bullet. Brenda Robinson of the Washington State Patrol Crime Lab testified that the presence of lead and melted fibers supported her conclusion that a bullet had passed through the rug. The defense expert, on the other hand, concluded that there was no lead, copper (present in some bullets), or melted fibers supporting such a conclusion.
¶ 13 Police also discovered that a woman named Margo Ducourno had lent her blue Ford Ranger pickup to Hale. Ducourno testified at trial that Jackson had been in her motel room with Hale and that he left several bags of his belongings there. Before checking out of the motel, Ducourno gave some of the items to Jackson's cousin. But she left other items behind. Among these items, police found a gun case with two empty ammunition magazines. Ducourno had also seen Hale handling a gun in the hotel room.
¶ 14 Jackson and Hale were initially charged as co-defendants with second degree attempted murder, first degree assault, and first degree burglary, all with firearm enhancements. After the trial court granted the State's motion to sever the trials on May 29, 2003, Jackson and Hale were charged by second amended information with first degree assault and first degree burglary, both with firearm enhancements, on June 18, 2003.
¶ 15 Before Jackson's jury trial, the State moved in limine to prohibit testimony that Pratt accepted a bribe from Hale regarding his testimony at Hale's trial, which had already taken place. The trial court determined that the defense could bring in the testimony as to the issue of Pratt's credibility. But the court also ruled that, in order to avoid misleading the jury, discussion of the bribe would open the door to the fact that Hale was found guilty at trial, which suggested that Pratt "didn't slant his testimony in favor of . . . Hale." 3 RP at 55. The defense stated, "I don't have a problem with that." 3 RP at 55.
¶ 16 At trial, the defense asked Pratt on cross examination whether he had accepted a bribe from Hale. Pratt admitted that he had accepted $100, but he denied lying at Hale's trial. On redirect, the State asked Pratt about his truthfulness at the Hale trial, and Pratt again denied lying. On re-cross, the defense asked Pratt whether he had been offered anything in exchange for his testimony in the present trial and again asked Pratt about Hale's bribe. Pratt stated that he had told Hale, "I am not gonna lie for you, but I'm not gonna make you sound like Satan, either." 3 RP at 141.
¶ 17 On redirect, the State asked Pratt a series of questions regarding whether his testimony in the Hale trial was consistent with his testimony in the present trial, which culminated in the question, "Are you aware *1186 . . . whether . . . Hale was convicted in the proceedings in which you testified against him?" 3 RP at 150. Jackson responded, "He got twenty-four years." 3 RP at 150. The defense immediately objected, and the court admonished the jury to disregard the answer. The State then asked Pratt if he was "aware if got [sic] convicted." 3 RP at 150. Pratt stated, "Yes, he was." 3 RP at 150. Pratt then moved for a mistrial on the grounds that discussion of sentencing was prejudicial. The trial court ruled that only a cautionary instruction was necessary.[8]
¶ 18 The jury convicted Jackson of first degree assault and first degree burglary, each with a firearm enhancement. The trial court calculated Jackson's offender score, including the Oregon offenses, as "8" for the assault, with a standard range of 209-277 months, and "10" for the burglary, with a standard range of 87-116 months. The court sentenced Jackson to 228 months for the assault and 116 months for the burglary, to run concurrently. He also received 120 months for the two firearm enhancements, to run consecutively, for a total standard range sentence of 348 months.

ANALYSIS

CLASSIFICATION OF OUT-OF-STATE OFFENSES
¶ 19 For the first time on appeal, Jackson contends that the trial court miscalculated his offender score when it included a 1996 Josephine County, Oregon conviction for unlawful use of a motor vehicle.[9] The State agrees that remand to determine the propriety of including the Oregon conviction in Jackson's offender score is necessary under State v. Ford, 137 Wash.2d 472, 973 P.2d 452 (1999).
¶ 20 The trial court calculated Jackson's offender score for first degree burglary at "10" and imposed a standard range sentence. Thus, even with a one-point deduction that would occur if the Oregon conviction were improperly included in his offender score, his standard range would not change. He would still have an offender score of "9 or more" and the standard range of 87-116 months would remain the same. See RCW 9.94A.525(10). But Jackson's offender score for his concurrent first degree assault conviction would be "7," with a standard range of 178-236 months instead of "8," with a standard range of 209-277. See RCW 9.94A.525(9).
¶ 21 Generally, issues not raised in the trial court may not be raised for the first time on appeal. See RAP 2.5(a); State v. Moen, 129 Wash.2d 535, 543, 919 P.2d 69 (1996). But illegal or erroneous computations of an offender score that alter the defendant's standard sentence range may be challenged for the first time on appeal. Ford, 137 Wash.2d at 477, 973 P.2d 452. If Jackson's Oregon conviction was improperly included in his offender score calculation, the maximum of his concurrent standard ranges would drop from 277 months to 236 months. Although he was sentenced to 228 months, within both standard ranges, we cannot say that the court would necessarily impose the same sentence if Jackson's offender score on the burglary was a "7" rather than an "8." Thus, we address whether the trial court erred in including Jackson's Oregon conviction in computing his offender score.
¶ 22 The Sentencing Reform Act of 1981(SRA), chapter 9.94A RCW, creates a grid of standard sentencing ranges based on the defendant's offender score and the seriousness level of the current offense. State v. Wiley, 124 Wash.2d 679, 682, 880 P.2d 983 (1994). The trial court calculates a defendant's offender score by totaling the defendant's prior convictions for felonies and certain juvenile offenses. Wiley, 124 Wash.2d at 683, 880 P.2d 983. Out-of-state convictions must be classified "according to the *1187 comparable offense definitions and sentences provided by Washington law." Wiley, 124 Wash.2d at 683, 880 P.2d 983 (quoting former RCW 9.94A.360(3) (1990)); see also RCW 9.94A.525(3). In calculating the offender score of an individual whose criminal history includes convictions from other jurisdictions, the sentencing court must (1) identify the comparable Washington offense; (2) classify the comparable Washington offense; and (3) treat the out-of-state conviction as if it were a conviction for the comparable Washington offense. State v. Cameron, 80 Wash.App. 374, 378-79, 909 P.2d 309 (1996) (citing State v. Weiand, 66 Wash.App. 29, 31-32, 831 P.2d 749 (1992)).
¶ 23 To classify an out-of-state conviction according to Washington law, the sentencing court must compare the elements of the out-of-state offense with the elements of comparable Washington offenses. State v. Morley, 134 Wash.2d 588, 606, 952 P.2d 167 (1998); Wiley, 124 Wash.2d at 684, 880 P.2d 983; Weiand, 66 Wash.App. at 31, 831 P.2d 749. If the elements are not identical or if the Washington statute defines the offense more narrowly than does the foreign statute, the trial court must review the record of the out-of-state conviction to determine whether the defendant's conduct would have violated the comparable Washington offense. Morley, 134 Wash.2d at 606, 952 P.2d 167.
¶ 24 Although some[10] have suggested that recent developments in the law now require the State to prove a defendant's criminal history beyond a reasonable doubt to a jury, no court has yet set such a standard (except in the context of the Persistent Offender Accountability Act[11]) and Jackson does not ask that we do so. Currently, to establish criminal history for sentencing purposes, the State must prove the defendant's prior convictions by a preponderance of the evidence. State v. Ross, 152 Wash.2d 220, 230, 95 P.3d 1225 (2004); State v. McCorkle, 137 Wash.2d 490, 495, 973 P.2d 461 (1999). Where the disputed issues have been fully argued to the lower court at sentencing, the State is held to the existing record and remand for resentencing without allowing further evidence to be adduced is appropriate. But where the defense has not specifically put the court on notice as to any apparent defects in his sentencing procedure, remand for an evidentiary hearing to allow the State to prove the belatedly disputed matters is appropriate. Ford, 137 Wash.2d at 485, 973 P.2d 452 (citing State v. McCorkle, 88 Wash.App. 485, 500, 945 P.2d 736 (1997), aff'd, 137 Wash.2d 490, 973 P.2d 461 (1999)). Compare Ross, 152 Wash.2d at 230, 95 P.3d 1225 (stating that although State generally bears burden of proving the existence and comparability of a defendant's prior out-of-state convictions, a defendant's affirmative acknowledgment that prior out-of-state convictions are properly included satisfies SRA).
¶ 25 In State v. Beals, 100 Wash.App. 189, 997 P.2d 941, review denied, 141 Wash.2d 1006, 10 P.3d 1074 (2000), the State presented the sentencing court with evidence of the defendant's 1974 North Carolina assault conviction via certified copies of a grand jury indictment, guilty plea, and judgment and sentence. But the State did not provide the North Carolina statute then in effect. Nor did the trial court compare the statutory elements of the North Carolina offense with Washington offenses. At sentencing, Beals did not explicitly dispute classification of the foreign conviction, but he did challenge the factual basis for his guilty plea to that charge. Beals, 100 Wash.App. at 197 n. 7, 997 P.2d 941.
¶ 26 Division One of this court remanded the case to the sentencing court to complete the statutory comparison and classification process. It declined to locate the North Carolina statute then in effect and compare the elements of the defendant's foreign *1188 conviction with a potentially comparable Washington offense, stating:

The proper forum for classification of out-of-state convictions is at the sentencing hearing, where the State can present necessary documentary evidence, the defendant can refute the State's evidence and arguments, and the court can then engage in the required comparison on the record to determine if the State met its burden of proof. "[C]lassification is a mandatory step in the sentencing process under the SRA," and the sentencing court should be required to complete its task. Ford, 137 Wash.2d at 483, 973 P.2d 452.
Beals, 100 Wash.App. at 196, 997 P.2d 941 (emphasis added). Division One's opinion in Beals notwithstanding, we think that where the sentencing court has neglected the proper statutory comparison, the appellate court may examine the elements of the foreign statute and, if the elements are identical to those of a Washington felony, determine the propriety of the defendant's offender score.
¶ 27 We review de novo a challenge to the classification of an out-of-state conviction. Beals, 100 Wash.App. at 196, 997 P.2d 941 (citing McCorkle, 88 Wash.App. at 493, 945 P.2d 736). At sentencing here, Jackson did not dispute the fact of his Oregon felony conviction or its inclusion in his criminal history. But he did not affirmatively acknowledge it, and he may raise the issue on appeal. See Ford, 137 Wash.2d at 477-78, 973 P.2d 452. Compare State v. Hunter, 116 Wash.App. 300, 302, 65 P.3d 371 (2003), aff'd by Ross, 152 Wash.2d 220, 95 P.3d 1225 (2004) (defendant not permitted to challenge on appeal the inclusion of out-of-state convictions in offender score where defense counsel affirmatively acknowledged to sentencing court the correctness of State's classification).[12]
¶ 28 Having compared the elements of the Oregon "unauthorized use of a vehicle" statute, it appears to cover a broader range of activity than the Washington statute that prohibits "taking a motor vehicle without permission." Former RCW 9A.56.070 (1975). The Oregon statute provides:
(1) A person commits the crime of unauthorized use of a vehicle when:
(a) The person takes, operates, exercises control over, rides in or otherwise uses another's vehicle, boat or aircraft without consent of the owner; or
(b) Having custody of a vehicle, boat or aircraft pursuant to an agreement between the person or another and the owner thereof whereby the person or another is to perform for compensation a specific service for the owner involving the maintenance, repair or use of such vehicle, boat or aircraft, the person intentionally uses or operates it, without consent of the owner, for the person's own purpose in a manner constituting a gross deviation from the agreed purpose; or
(c) Having custody of a vehicle, boat or aircraft pursuant to an agreement with the owner thereof whereby such vehicle, boat or aircraft is to be returned to the owner at a specified time, the person knowingly retains or withholds possession thereof without consent of the owner for so lengthy a period beyond the specified time as to render such retention or possession a gross deviation from the agreement.

*1189 (2) Unauthorized use of a vehicle, boat or aircraft is a Class C felony.
OR.REV.STAT. § 164.135 (1971).
¶ 29 But former RCW 9A.56.070 states:
(1) Every person who shall without the permission of the owner or person entitled to the possession thereof intentionally take or drive away any automobile or motor vehicle, whether propelled by steam, electricity, or internal combustion engine, the property of another, shall be deemed guilty of a felony, and every person voluntarily riding in or upon said automobile or motor vehicle with knowledge of the fact that the same was unlawfully taken shall be equally guilty with the person taking or driving said automobile or motor vehicle and shall be deemed guilty of taking a motor vehicle without permission.[[13]]
(2) Taking a motor vehicle without permission is a class C felony.
We can conceive of a situation in which a defendant could commit the Oregon crime without committing the Washington crime. See State v. Russell, 104 Wash.App. 422, 449, 16 P.3d 664 (2001); McCorkle, 88 Wash.App. at 496, 945 P.2d 736. Thus, on this record, we cannot say that the crime Jackson committed in 1995 would have been a felony if committed in Washington. We, therefore, vacate Jackson's sentence and remand for a factual determination as to whether Jackson's 1995 violation of the Oregon statute as committed would also have been a violation of the corresponding Washington offense. If so, Jackson's offender score is properly calculated; if not, Jackson's offender score should be recalculated without the Oregon conviction.[14] On remand, the State may introduce evidence of the conviction, including the charging document, affidavit of probable cause, trial record, statement of defendant on plea of guilty, or other such documents, to support its proper classification. See Ford, 137 Wash.2d at 486, 973 P.2d 452.
¶ 30 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: HOUGHTON and BRIDGEWATER, JJ.
NOTES
[1] RCW 9A.36.011(1)(a).
[2] RCW 9A.52.020(1).
[3] Former RCW 9.94A.510(3) (2000).
[4] See former RCW 9.94A.510(3).
[5] See RAP 10.10(a) which states: "A defendant/appellant in a review of a criminal case may file a pro se statement of additional grounds for review to identify and discuss those matters which the defendant/appellant believes have not been adequately addressed by the brief filed by the defendant/appellant's counsel."
[6] Jackson also makes three additional arguments, but those issues (failure to prove each element of the charged crime beyond a reasonable doubt, lack of fair trial based on the State's improper influence of the jury, and miscalculation of offender score) are essentially the same as those addressed in his counsel's brief.
[7] Pratt's friend, Amber Hamrick, testified that for $50 she had sold Jackson a cell phone that she had bought from a man named Robert Norris. She was supposed to replace that phone with another from Norris, but he never provided her with a replacement. Pratt had nothing to do with the cell phone transaction.
[8] The court instructed the jury, "You will disregard any evidence that either was not admitted or that was stricken by the court." Clerk's Papers (CP) at 21.
[9] A handwritten "Declaration of Criminal History" dated September 24, 2003, and signed by the prosecutor appears in the record. It was not signed by Jackson or his counsel. The document lists the conviction as "Unlawful Use of a Motor Vehicle," Cause No. 95CR0591, Josephine County, Oregon. Date of the crime is listed January 23, 1995 to February 12, 1995, and date of conviction as July 15, 1996.
[10] See Shepard v. United States, ___ U.S. ___, 125 S.Ct. 1254, 1264, 161 L.Ed.2d 205 (2005) (Thomas, J., concurring in part and concurring in the judgment).
[11] Recently, in In re Personal Restraint of Lavery, 154 Wash.2d 249, 256-58, 111 P.3d 837 (2005), our Supreme Court held that where the statutory elements of a foreign conviction are broader than those under a similar Washington statute, the Act (former RCW 9.94A.120 (1998)) is unconstitutional insofar as it permits a sentencing judge to make findings about the underlying facts of the foreign conviction based on a preponderance of the evidence.
[12] In Hunter, at the time the defendant entered his guilty plea, he disputed the State's assertion that his offender score was "5," based on five out-of-state convictions. At sentencing, the State acknowledged that it was unable to prove that one of the five out-of-state convictions was comparable to a Washington felony and that the defendant's offender score was therefore "4." In response, defense counsel expressly conceded that the only other conviction that Hunter was challenging was properly included in his offender score. Defense counsel also acknowledged that the State had properly calculated Hunter's standard range. Hunter, 116 Wash.App. at 302, 65 P.3d 371. On appeal, Division One of this court stated that, "Because the defense affirmatively acknowledged the correctness of the State's classification of the out-of-state convictions, the sentencing court properly included the convictions in Hunter's offender score." Hunter, 116 Wash.App. at 302, 65 P.3d 371. Here, the State points out in its brief on appeal that the defense "affirmatively acknowledged" the classification because it acknowledged the correct standard range. Br. of Resp't at 9. But the discussion of the standard range before the sentencing court occurred in the context of a merger argument regarding the current convictions, and the defense did not affirmatively acknowledge the classification of Jackson's Oregon conviction.
[13] The Washington statute can be violated by two alternative means. Under the "taking" prong, the elements are: (1) taking or driving away without the owner's permission (2) a motor vehicle (3) intentionally. Under the riding prong, the elements are: (1) voluntarily riding in a motor vehicle (2) with knowledge that it was unlawfully taken. State v. Walker, 75 Wash.App. 101, 106, 879 P.2d 957 (1994), review denied, 125 Wash.2d 1015, 890 P.2d 20 (1995).
[14] A correct offender score must be calculated before a presumptive or exceptional sentence is imposed. Ordinarily, imposition of an exceptional sentence requires a correct determination of the standard range. State v. Tili, 148 Wash.2d 350, 358, 60 P.3d 1192 (2003); State v. Parker, 132 Wash.2d 182, 189, 937 P.2d 575 (1997). Remand is necessary when the offender score has been miscalculated unless the record makes clear that the trial court would impose the same sentence. Tili, 148 Wash.2d at 358, 60 P.3d 1192; Parker, 132 Wash.2d at 189, 937 P.2d 575.