IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69527-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| GARY WADE, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 30, 2015 |

SCHINDLER, J. — A jury convicted Gary Wade of murder in the second degree of

Michelle Thornton. Wade seeks reversal, arguing the court erred by (1) excluding other

suspect evidence, (2) admitting testimony in violation of his right to confrontation, (3)

denying his motion for a mistrial, and (4) refusing to instruct the jury on the lesser

included offense of manslaughter in the first degree and manslaughter in the second

degree. Wade also contends the court erred by including a prior Utah conviction in the

calculation of his offender score. We affirm.

FACTS

In 2010, Michelle Thornton worked as a cashier at the Upper Queen Anne

Safeway and lived at the Vine Court Apartments in Belltown. Thornton was a mature

and "dependable" employee, "always on time, . . . always well dressed." The Vine Court

Apartments is a secure building with a "high end" video security system. To gain

access to the building, a person must have a key or be "buzzed in" by a resident through a keypad.

Thornton was friendly and outgoing and invited people to "her apartment quite a bit." Thornton had a view of the Space Needle from her apartment and hosted an annual New Year's Eve party with her friends to watch the fireworks. Thornton's friends described her as "fun to be around. She loved life and loved getting outdoors." Thornton also liked to drink alcohol and use drugs. Gary Wade often delivered cocaine to Thornton at her apartment and sometimes stayed and smoked crack cocaine with Thornton and her friends.

On December 28, 2010, Thornton posted an invitation to her annual New Year's Eve party on her Facebook page. Thornton called her longtime "neighbor and friend" of 21 years Richard Bollinger twice that day to ask him to get her some "crack." Bollinger told her he "was trying to get off [drugs]" and had erased from his phone "all the contact information for anybody who [he] knew had any relationship to drugs and drug dealing." Later that night, Thornton went out for pizza with her friend Charles Cruise. Thornton and Cruise had been "great friends" for 20 years.

Thornton did not show up for her scheduled 2:15 p.m. shift at Safeway on December 30 or for her morning shift the next day, December 31. Safeway Manager Gregory Fox thought it "odd" because she had never "just failed to appear." It was "not like [Thornton] at all to miss work."

Thornton's friend and coworker Andrew Laissue called Thornton on December 30 but was not able to reach her. Cruise tried calling Thornton on December 29 or 30.

Cruise said someone picked up the phone and then "hung it up" without saying anything. Thornton's New Year's Eve party did not take place as planned.

On January 3, 2011, Cruise asked the police to check on Thornton. Seattle Police Department Officer Mark Bisson and Officer Robin Roberts went to the apartment building with Cruise. The apartment manager let them into Thornton's apartment. Cruise stood in the doorway while the officers quickly checked the living room, kitchen, bedroom, and bathroom. The officers were inside Thornton's apartment for only "15 to 30 seconds" because it was a "welfare check . . . on the person to see if they were home."

On January 4, Thornton's father filed a "missing person" report. On January 6, Detective Tony Eng and Detective David Ogard used the apartment manager's key to unlock the door to Thornton's apartment. During the search of the apartment, Detective Ogard discovered Thornton's body inside the hall closet. Thornton was lying face up with her head "jammed against the door" and her feet "pressed up against the wall." Thornton was naked from the waist down and had dried blood on her forehead. Detectives Eng and Ogard contacted Homicide Detective Timothy DeVore and Detective Jeffrey Mudd, the crime scene investigation unit, and a pathologist from the King County Medical Examiner's Office.

Seattle Police Department Crime Scene Investigation Unit Detective Kimberly Biggs testified there were no pry marks or signs of forced entry on the door or doorframe of the apartment. The police found a broken phone cord by the front door but the telephone was missing.[1] The police did not find any keys to the apartment.

---

[1] Thornton had a landline and did not own a cell phone.

3

Detective Mudd testified that the living room looked as though "there might have been some kind of struggle." The couch was "askew" and there was a broken picture frame on the floor. To the left of the couch was a beige extension cord with "bent prongs and suspected feces." The police found a pink bathrobe to the right of the couch with what appeared to be fecal stains. They found the belt to the bathrobe on the living room floor.

The police also found feces on the living room floor, on a towel in the bathroom, and on pajama bottoms in the bedroom. They found underwear tangled up with blue tights, stained with feces, in the bathtub. The tights were partly inside out, as if "removed off a person at the same time [as the underwear] in one motion."

King County Medical Examiner's Office Forensic Pathologist Dr. Timothy Williams examined Thornton's body at the apartment. The trail of dried blood from the abrasion on the right side of her nose ran across her forehead "in a direction against gravity" as compared to the position of the body in the closet. Dr. Williams testified the line of dried blood on her forehead was "consistent with the body having been moved at some point after that blood had started to run."

Dr. Williams also observed "a number of abrasions on her neck" and "a large number of . . . petechial hemorrhages, small pinpoint hemorrhages in the skin of the face." Dr. Williams testified that Thornton's face was "engorged with blood," creating the "distinct possibility" that she had been strangled. According to Dr. Williams, it is "very common" for a person to "evacuate their bowels" upon death.

Dr. Williams estimated the time of death at 1:00 a.m. on December 30. A toxicology report later showed Thornton had a blood alcohol level of .07 grams per

decaliter and her blood contained cocaine metabolites. Dr. Williams concluded the death was a homicide, and the manner of death was asphyxia from strangulation.

Seattle Police Department Latent Fingerprint Examiner Betty Newlin processed the apartment for latent prints. Washington State Patrol Crime Laboratory (WSPCL) Forensic Scientist Kari O'Neill obtained swabs from Thornton's body for DNA[2] testing. O'Neill later determined the DNA profile from the left and right nipple was "consistent with coming from the same unknown male individual."

Initially, the police investigation focused on Thornton's ex-boyfriend Georgios Broutzakis. In June 2009, Broutzakis was convicted of assaulting Thornton and the court issued a no-contact order. The police interviewed Broutzakis on January 21.

Broutzakis denied any involvement in Thornton's death and gave the police a DNA sample. Broutzakis acknowledged leaving nine of the saved voicemail messages on Thornton's phone, including several threatening messages. Five of the messages are from May 2009 and May 2010, and four of the messages are from August, October, and November 2010. The final three messages are not threatening. In the last three messages, Broutzakis tells Thornton he loves her, he is "trying to change," and he is going to go to "treatment." Broutzakis told police the last time he was in Thornton's apartment was in October 2010 and his last contact with her was the voicemail he left in November 2010.

The DNA profile from Broutzakis did not match any of the evidence recovered from the apartment or Thornton's body. The police examined fingerprints from Broutzakis against "every print of comparison value." His fingerprints did not match any of the latent prints.

---

[2] Deoxyribonucleic acid.

5

Police reviewed hundreds of hours of video from the four security system cameras at the Vine Court Apartments for late December 2010 through early January 2011. The police did not see Broutzakis in any of the video from the four cameras. However, the cameras located at the main entry and lobby show a man, later identified as Gary Wade, entering and exiting the apartment building almost every night between December 22 and 29 and several times on December 30.

The video shows Wade stayed overnight on December 25 and left at 5:42 a.m.[3] on December 26. Wade next enters the building at 7:55 p.m. on December 29 and exits 13 minutes later. Thornton leaves the building through the alleyway door a few minutes later. The surveillance video shows Thornton and Wade enter the building together at 8:17 p.m. At 9:38 p.m., Thornton exits the building and at 9:44 p.m., uses her key to get back inside.

At 12:48 a.m. on December 30, Thornton leaves the building again and at 1:01 a.m., lets herself back in with a key. At 2:26 a.m., Wade leaves the building but returns a minute later and uses the keypad to gain access. At 2:14 p.m., Wade leaves the apartment building with a bag slung over one shoulder and carrying a plastic grocery bag. When Wade returns at 4:09 p.m., he lets himself into the building with a key. The last time Wade appears on the surveillance video is when he leaves the apartment building approximately 10 minutes later at 4:20 p.m.

Detective Randy Moore arrested Wade on February 26. During a lengthy interview, Wade admitted "provid[ing]" cocaine to Thornton in the past and smoking "crack" with her in her apartment on several occasions. At first, Wade maintained the

---

[3] Throughout the opinion, surveillance video times have been adjusted by 39 minutes in accord with the testimony that the time stamp on the surveillance video was "39 minutes slow."

last time he had been in Thornton's apartment was before Christmas. Wade told the detectives that he tried calling Thornton after Christmas but said she did not answer her phone.

The detectives then showed Wade the time-stamped keypad entries and time-stamped photographs from the surveillance video that showed he entered and exited the building on December 29 and 30, and in the late afternoon of December 30, he used a key to enter the apartment building. In response, Wade said that he and Thornton had sex in the early morning hours of December 30, and Thornton gave him her key to "mak[e] a [drug] run." Wade told the detectives that at some point, Thornton "said she didn't feel good." Wade insisted he returned the key to Thornton and she was still alive when he left. Wade also insisted that Thornton called him after he left on December 30 "because she need[ed] to see [him]."

However, Wade later admitted placing Thornton in the closet after she had a heart attack. Wade said a neighbor knocked on the door, and he "panicked."

> See okay when I seen her laid out right there, right. You could tell she
> had a heart attack. Just laid out. Then I panicked. But then I was about
> to leave and I grabbed my bag and was about to leave out. And then the
> neighbor knock on the door. So I got scared and put her nicely in the
> closet and closed the door and left.

The police obtained a DNA sample from Wade. O'Neill compared the DNA to the fingernail clippings from Thornton, the belt from the pink bathrobe, and the beige extension cord. Wade's DNA matched the DNA profile of the unknown male O'Neill found on Thornton's body and the DNA found under Thornton's fingernails. Wade's fingerprints matched the latent prints found on beer cans in Thornton's apartment. Phone records for Wade and Thornton established that the last time he called Thornton

was the evening of December 29, 2010. The State charged Wade with murder in the second degree.

During the 13-day jury trial, more than 30 witnesses testified and the court admitted into evidence more than 100 exhibits, including surveillance video from the apartment building and time-stamped photographs from the video. The court also admitted into evidence and played the video of the police interview with Wade.

Several of Thornton's friends, including Bollinger, testified that Wade supplied Thornton with cocaine and Wade was at her apartment on several different occasions. Bollinger testified that on at least four or five occasions, Wade was already there when he arrived.

Bollinger also testified that Thornton was "outgoing to a fault," and often "would allow people to sleep over[night] in her living room that I wouldn't have chosen to allow to sleep over in my living room." Bollinger said that Wade "crashed" at Thornton's apartment "at least a few weeks" before Christmas 2010.

Dr. Williams testified that Thornton died of asphyxia from strangulation. Dr. Williams stated that the "discontinuous nature of the abrasions" on Thornton's neck were more consistent with manual strangulation than ligature strangulation. Dr. Williams testified that with sufficient pressure "consistently applied," a person could be rendered unconscious within 10 to 15 seconds, but it would take 1 to 2 minutes for asphyxia to occur. Dr. Williams estimated the time of death at around 1:00 a.m. on December 30.

The State presented evidence establishing Thornton was not alive when Wade left her apartment the afternoon of December 30. In addition to the testimony that

Thornton failed to show up for her scheduled 2:15 p.m. shift at Safeway, Detective DeVore testified that records from the Vine Courts Apartments door entry system show the last time Thornton granted access to the building for someone was at 2:27 a.m. on December 30, and the surveillance video confirms the last person Thornton "buzzed in" was Wade at 2:27 a.m. Detective DeVore also testified that the last outgoing phone call made from the apartment was at 3:00 a.m. on December 30 to an Internet dial-up company, and that there were unanswered voicemail messages left on December 30 and 31. Detective David Dunn said that the last time anyone used Thornton's computer was at 4:12 a.m. on December 30. The State also presented evidence that the last activity on her Key Bank account was an ATM[4] withdrawal on December 29.

WSPCL Forensic Scientist O'Neill testified that in addition to the swabs from Thornton's body, she tested the beige extension cord, the belt from the pink bathrobe, and Thornton's fingernail clippings for DNA. O'Neill testified that DNA testing excluded Wade as a possible contributor to the DNA on the extension cord. O'Neill testified that the DNA on the bathrobe belt was a "mixed profile that was consistent with at least three people" and Thornton and Wade were "possible contributors." O'Neill testified that the DNA found on Thornton's nipples and underneath her fingernails matched Wade's DNA. O'Neill stated that the probability of finding someone else with the same DNA profile was "one in 540 quadrillion." O'Neill also testified there were no sperm cells or semen in the samples from Thornton.

Fingerprint examiner Newlin testified that Wade's fingerprints matched the prints found on four beer cans and the coffee table in the apartment.

---

[4] Automated teller machine.

The defense called three witnesses. Dr. Donald Riley testified there may have been cross-contamination of the DNA evidence because the fingernail evidence was not "kept separate" from Wade's reference sample. Dr. Riley also questioned the method of calculating the "inclusion statistic" in the mixed DNA profile found on the bathrobe belt, stating that the test O'Neill used to conclude Wade was a possible contributor was "designed primarily for single source DNA samples."

The defense called Broutzakis to testify. Broutzakis said he dated Thornton "on and off for a couple years. Maybe a little less." Broutzakis testified that Thornton gave him her keys "[t]wo or three times" to "go to Ballard and score [drugs] and come back so [he] wouldn't have to ring the bell," but he never had her keys for more than a day. Broutzakis said his relationship with Thornton ended approximately six months before Christmas 2010.

The defense investigator testified that he reviewed the surveillance video from December 29 and 30, 2010, and he saw individuals gaining entry to the building by "either coming in without a key or propping open" an alleyway door. But on cross-examination, the investigator testified that on December 30, between 2:14 p.m. when Wade left the apartment building and 4:09 p.m. when Wade returned, he did not see anyone entering the building through the front door without a key or through the alleyway door.

In rebuttal, O'Neill testified in response to the testimony of Dr. Riley. O'Neill stated that Wade's reference sample was never "open and near the open . . . evidence samples in this case."

At the conclusion of the case, Wade asked the court to instruct the jury on the inferior degree offense of both manslaughter in the first degree and manslaughter in the second degree. The court refused to instruct the jury on the inferior offenses. The court ruled no evidence showed Wade committed either manslaughter in the first degree or manslaughter in the second degree.

In closing, the prosecutor argued Wade "strangled Ms. Thornton to death, and that he did it before he left the first time at two p.m. on December 30th." Defense counsel argued the State did not prove motive or when Thornton died. The attorney also argued there was no evidence of Wade's DNA on Thornton's neck or on the extension cord, and noted there was DNA from a third unidentified individual on the bathrobe belt. In addition, the attorney argued the investigation into Thornton's death was flawed because the police failed to investigate other possible suspects, including Bollinger, and there were ways to enter the apartment building without appearing on the surveillance video.

The jury convicted Wade of murder in the second degree.

Before the sentencing hearing, the State submitted a memorandum asserting that with an offender score of 3, the standard sentence range was 154 to 254 months. The offender score included three prior felony convictions: a 2002 Florida conviction, a 2002 Georgia conviction, and a 2006 Utah conviction.

Wade acknowledged the existence of the prior convictions but argued the Utah conviction for attempted distribution of cocaine was not comparable. The court disagreed. Based on an offender score of 3, the court imposed a high-end standard range sentence of 254 months.

ANALYSIS

Other Suspect Evidence

Wade contends the trial court violated his constitutional right to present a defense by excluding evidence that Thornton's ex-boyfriend Broutzakis committed the crime.

A criminal defendant has a constitutional right to present a defense under the Sixth Amendment of the United States Constitution and article I, section 22 (amendment 10) of the Washington Constitution. State v. Maupin, 128 Wn.2d 918, 924, 913 P.2d 808 (1996). But the right to present a defense is not absolute. Montana v. Engelhoff, 518 U.S. 37, 42, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996); Maupin, 128 Wn.2d at 924-25. The right to present a defense does not extend to irrelevant or inadmissible evidence. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).

The Washington Supreme Court recently addressed the admissibility of other suspect evidence in State v. Franklin, 180 Wn.2d 371, 325 P.3d 159 (2014). In Franklin, the court concluded the trial court erred in excluding other suspect evidence by considering the strength of the State's case against the defendant and requiring the defense to present direct rather than circumstantial evidence that someone else committed the crime. Franklin, 180 Wn.2d at 378-79.

The court held the standard for relevance of other suspect evidence is whether there is evidence " 'tending to connect' someone other than the defendant with the crime." Franklin, 180 Wn.2d at 382 (quoting State v. Downs, 168 Wash. 664, 667, 13 P.2d 1 (1932)). "[T]he probative value must be based on whether the evidence has a logical connection to the crime—not based on the strength of the State's evidence."

12

Franklin, 180 Wn.2d at 381-82 (citing Holmes v. South Carolina, 547 U.S. 319, 330, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). Mere evidence of motive, or motive coupled with threats of the other person, " 'is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.' " Franklin, 180 Wn.2d at 379-80 (quoting State v. Kwan, 174 Wash. 528, 533, 25 P.2d 104 (1933)). Further, " '[r]emote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose.' " Franklin, 180 Wn.2d at 380[5] (quoting Kwan, 174 Wash. at 533); see also Maupin, 128 Wn.2d at 927. "[S]ome combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." Franklin, 180 Wn.2d at 381.

We review a trial court's decision to exclude other suspect evidence for abuse of discretion. Franklin, 180 Wn.2d at 377 n.2. The court must determine whether the probative value is outweighed by other factors, such as " 'unfair prejudice, confusion of the issues, or potential to mislead the jury,' " and focus the trial " 'on the central issues by excluding evidence that has only a very weak logical connection to the central issues.' " Franklin, 180 Wn.2d at 378 (quoting Holmes, 547 U.S. at 326, 330).

Below, the defense conceded there was no DNA, fingerprint, or any "specific evidence that specifically indicates that it had to be Georgios Broutzakis who was in [Thornton's] apartment." Nonetheless, the defense attorney argued the evidence did not "preclude" the possibility that Broutzakis committed the murder. The attorney argued the 2009 assault conviction of Broutzakis, the no-contact order prohibiting him from contacting Thornton, and the voicemails he left on Thornton's answering machine "contained implied threats" that established motive and "a substantial step towards

---

[5] Alteration in original.

13

committing future acts of violence." The defense also pointed to statements Thornton made to police after the 2009 assault that Broutzakis previously strangled her and washed off blood in the bathtub.[6]

While the defense acknowledged Broutzakis did not appear on the surveillance video from Thornton's apartment and no witness would testify to letting Broutzakis in the building, the attorney argued there were "other ways" to get into the building without being detected. The defense asserted the building manager would testify that "there was a time" when tenants were letting Broutzakis into the building without Thornton's knowledge.

The defense also argued that a few days before the murder, Thornton told a friend she was "scared that her ex-boyfriend was getting out of jail soon and that he was going to come after her." However, the attorney conceded there was "some question" as to whether Thornton was referring to Broutzakis because Thornton did not specifically identify the "ex-boyfriend" and Broutzakis was not "in custody in December."

The State argued there was no "admissible evidence that even remotely links Broutzakis to Thornton's murder." The State pointed out Broutzakis did not appear on the Vine Court Apartments video surveillance system; no witness could place him near Thornton's apartment around the time of the murder or say he was still in contact with Thornton; and the most recent voicemail messages from Broutzakis in August, October, and November were not threatening. The prosecutor also told the court that during an interview with the building manager, the building manager said that Broutzakis

---

[6] On appeal, Wade asserts "Broutzakis previously had been convicted of assaulting Ms. Thornton by strangling her." But in his trial brief, Wade stated that Broutzakis assaulted Thornton by striking her in the head with a leg of a coffee table. According to Wade's trial brief, after this assault, Thornton told police Broutzakis had "beat her up" before, including strangling her on three occasions.

previously gained access to the apartment building by following other people through the front door and not "through some secret entry."

Unlike in <u>Franklin</u>, the court properly focused solely on the connection of the proffered other suspect evidence to the crime. For example, the court asked the defense whether there was "any evidence that [Broutzakis] was present in that apartment."

> [S]o I just need some facts that's going to help me make the point of connection that this is not just again a bad actor out there who's part of this person's past. It's just got to be a little bit more. There has to be some nexus or some connection to a nexus or in connection to the event that is at issue in this case.

At the conclusion of the lengthy pretrial hearing, the court ruled the evidence Wade sought to admit was speculative and relied on inadmissible hearsay.

> The evidence proffered . . . is speculative, and it relies upon a great deal of hearsay that would not be admissible.
> 	Let me just say that I recognize that a defendant has a right to present a Defense, but we know that that right is not absolute. The evidence proffered needs to be relevant and not speculative.
> 	If there was some evidence that Georgios Broutzakis was at the apartment during the relevant time period, I can assure you that this court would be coming to a different conclusion. Mr. Broutzakis may be a bad actor with a violent history involving Ms. Thornton, and in fact may have a motive to harm her, but the cases that I've read tells us that motive alone is not enough.
> 	The evidence proffered here is far too tenuous, and there's not a sufficient foundation of facts or circumstances that the other suspect evidence being offered should be allowed.

The court did not abuse its discretion in excluding speculative and inadmissible evidence that Broutzakis murdered Thornton. There was no physical evidence connecting Broutzakis to the murder and no evidence Broutzakis was anywhere near Thornton's apartment when the crime occurred. While, as the trial court described, the evidence indicates Broutzakis was a "bad actor with a violent history involving Ms.

15

Thornton," the facts and circumstances do not show a nonspeculative link between Broutzakis and the crime.

The cases Wade relies on, State v. Clark, 78 Wn. App. 471, 898 P.2d 854 (1995), and Holmes, are distinguishable. Unlike here, in Clark and Holmes, admissible evidence connected someone else to the crime.

In Clark, the defendant sought to introduce evidence that his girlfriend's estranged husband set fire to the house the defendant used for business. Clark, 78 Wn. App. at 473. Specifically, that the estranged husband had previously threatened to set his ex-wife's house on fire and warned her to " 'watch it' " because he knew how to start fires without detection. Clark, 78 Wn. App. at 480, 475. The estranged husband had also told the defendant's ex-wife that it was " 'too bad' " the defendant was in jail for something he did not do, and his vehicle was seen near the house prior to the fire. Clark, 78 Wn. App. at 475, 480. We reversed the decision to exclude the evidence because there was evidence of prior threats and the opportunity to commit the crime. Clark, 78 Wn. App. at 474, 479-80. We held the evidence "provide[d] a trail of evidence sufficiently strong to allow its admission at trial." Clark, 78 Wn. App. at 480.

In Holmes, the defendant was accused of beating, raping, and robbing an elderly woman. Holmes, 547 U.S. at 321-22. The defendant sought to introduce evidence that another person was responsible, including testimony from several witnesses placing the other person in the neighborhood the morning of the assault, testimony from four witnesses that the other person had either acknowledged the defendant was " 'innocent' " or had actually admitted to committing the crimes, and testimony from another witness refuting the other person's alibi. Holmes, 547 U.S. at 323.

The evidence in this case is similar to the evidence in State v. Mezquia, 129 Wn. App. 118, 118 P.3d 378 (2005). In Mezquia, the defendant sought to admit evidence that the victim's ex-boyfriend committed the murder, pointing to the fact that the victim expressed extreme anger and frustration toward him just before her death, the victim was looking for her ex-boyfriend the evening she was murdered, and a friend of the victim said the ex-boyfriend had previously attacked her. Mezquia, 129 Wn. App. at 123-24. On appeal, we concluded that because there was no evidence the ex-boyfriend had the opportunity to commit the crime, no evidence the victim had contact with the ex-boyfriend the night she was killed, and no physical evidence connecting the ex-boyfriend to the crime, the court did not abuse its discretion in excluding the other suspect evidence. Mezquia, 129 Wn. App. at 125-26.

We hold that because there is no admissible evidence pointing to a nonspeculative link between Broutzakis and the crime, the court did not abuse its discretion in excluding other suspect evidence.

Debit Card Transaction

Wade contends admission of the hearsay testimony that the last debit card transaction on Thornton's account was December 29 violated his constitutional right to confrontation. We agree.

We review alleged confrontation clause violations de novo. State v. Jasper, 174 Wn.2d 96, 108, 271 P.3d 876 (2012). The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation clause "bars 'admission of testimonial statements of a witness who did not appear at trial unless he

was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (quoting Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). Testimonial statements include documents "created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation." Bullcoming v. New Mexico, __ U.S. __, 131 S. Ct. 2705, 2717, 180 L. Ed. 2d 610 (2011) (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)).

Key Bank Financial Crime Investigator and Finance Record Custodian Janet McGinnis testified that although Thornton's bank statement showed a debit card transaction at the Belltown Market had posted on December 31, based on her personal knowledge, the actual transaction occurred earlier because merchant transactions generally take between 24 and 72 hours to post. McGinnis testified her "investigation showed that [Thornton's] last transaction was the 29th." But McGinnis admitted she obtained information about when the last debit card transaction occurred from Key Bank investigator Sarah Anderson.

We conclude admission of the hearsay testimony of McGinnis violated the confrontation clause. However, we conclude the error was harmless beyond a reasonable doubt. "A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict cannot be attributed to the error." State v. Lui, 179 Wn.2d 457, 495, 315 P.3d 493 (2014).

The overwhelming untainted evidence established Thornton was not alive on December 31. Thornton was always on time, but she did not show up for her scheduled

2:15 p.m. shift at Safeway on December 30 or the following day. The last time someone from Thornton's apartment "buzzed someone in" was December 30. The last outgoing call from Thornton's landline was in the early morning of December 30, and there were unheard messages from December 30 and 31 left on Thornton's voicemail. The last time anyone used Thornton's computer was at 4:12 a.m. on December 30. Friends were not able to reach Thornton after December 30 and she did not hold her planned New Year's Eve party. And in the videotaped interview with police, Wade admits that he was with Thornton on December 30, that Thornton died, and that he placed her in the closet before leaving the apartment later that afternoon.

<u>Jury Instruction on Lesser Included Offense</u>

Wade asserts the court erred in refusing to instruct the jury on the lesser included offense of manslaughter in the first degree and manslaughter in the second degree. Below, Wade argued that because "this is a circumstantial evidence case" and there was no evidence "as to what exactly occurred," the court should instruct the jury on the lesser included offense of manslaughter.

> Essentially we don't know — the jury doesn't have any direct evidence as to what happened in that room, and so given that we believe that there is a basis to ask for those two lessers given that the State — how the State has charged this case.

The State argued there was no evidence to support instructing the jury on manslaughter in the first or second degree.

> In this case there is simply no evidence of any reckless or negligent act o[n] behalf of the defendant. Either he did it or he didn't.
> And there's been no testimony, the defendant did not testify about how this occurred or what happened. All we have him saying is that he was there and that he put her in the closet. There's nothing indicating any sort of reckless behavior or negligent behavior.

The trial court refused to instruct the jury on the inferior degree offenses because the evidence did not establish that Wade committed manslaughter in the first degree or manslaughter in the second degree.

> I have had the opportunity to give it some thought even before frankly any instructions were being offered, and I'm going to decline to include a lesser, and that's only because there has to be some, even if small, evidence that would support giving those instructions. At this point and I have to admit that I agree with the State that it's either guilty or not.
>
> And it is a case of circumstantial evidence and it very well could be that this jury is going to make a finding of not guilty based on the evidence that's been presented. But I don't think that there's anything that would support a lesser included at this point.

We review a trial court's decision on whether to instruct the jury on an inferior degree offense de novo. State v. Corey, 181 Wn. App. 272, 276, 325 P.3d 250 (2014) (citing State v. Fernandez-Medina, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000); State v. Dearbone, 125 Wn.2d 173, 178, 883 P.2d 303 (1994)). A criminal defendant is entitled to an instruction on a lesser degree offense if "(1) each of the elements of the lesser offense is a necessary element of the charged offense and (2) the evidence in the case supports an inference that the lesser crime was committed." State v. Henderson, No. 90154-6, 2015 WL 847427, at *4 (Wash. Feb. 26, 2015) (citing State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978)).

The State concedes that the legal prong of the test was met. We accept the State's concession as well taken.[7] The factual prong of the test is "more particularized than that required for other jury instructions." Fernandez-Medina, 141 Wn.2d at 455. In

---

[7] To find a person guilty of murder in the second degree requires proof that the defendant had "intent to cause the death of another person but without premeditation," and that the defendant did "cause[ ] the death of such person or of a third person." RCW 9A.32.050(1)(a) (emphasis added). A person commits the crime of manslaughter in the first degree when he "recklessly causes the death of another person." RCW 9A.32.060(1)(a) (emphasis added). A person commits the crime of manslaughter in the second degree when he "with criminal negligence . . . causes the death of another person." RCW 9A.32.070(1) (emphasis added).

20

determining the factual prong, whether the evidence supports an inference that the lesser crime was committed, we review the evidence in the light most favorable to the party requesting the instruction. Fernandez-Medina, 141 Wn.2d at 455-56. The evidence must "raise[ ] an inference that the defendant committed the lesser crime instead of the greater crime." Henderson, 2015 WL 847427, at *1 (citing Fernandez-Medina, 141 Wn.2d at 455-56). "If a jury could rationally find a defendant guilty of the lesser offense and not the greater offense, the jury must be instructed on the lesser offense." Henderson, 2015 WL 847427, at *1 (citing Fernandez-Medina, 141 Wn.2d at 456).

Wade claims that because there was no proof Thornton was strangled manually or with a ligature, strangulation could have been either reckless or the result of criminal negligence. The undisputed evidence does not support Wade's argument.

There was no evidence that the strangulation was either reckless or the result of criminal negligence. Dr. Williams testified that Thornton died of asphyxia due to strangulation, and that death would take one to two minutes of continuous pressure. The undisputed testimony established that whether Thornton was intentionally strangled manually or with a ligature, Wade had to continue to apply pressure, even after she lost consciousness, for one to two minutes. Because no jury could rationally find Wade guilty of manslaughter in the first degree or manslaughter in the second degree and not murder in the second degree, the court did not err in denying the request to instruct the jury on the inferior degree offense.

Motion for Mistrial

Wade asserts the court erred in denying his motion for a mistrial after a police officer referred to a "recent booking photo." This court reviews a trial court's decision to deny a motion for mistrial for abuse of discretion. State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). A trial court abuses its discretion in denying a motion for a mistrial only if its decision is manifestly unreasonable or based on untenable grounds. State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006).

A trial court has broad discretion to rule on irregularities during the course of a trial. State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). The trial court is in the best position to determine if a trial irregularity caused prejudice. State v. Perez-Valdez, 172 Wn.2d 808, 819, 265 P.3d 853 (2011). The court should grant a mistrial "only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." State v. Mak, 105 Wn.2d 692, 701, 718 P.2d 407 (1986). Ultimately, we will reverse the trial court only if there is a substantial likelihood the trial irregularity prompting the mistrial motion affected the jury's verdict. State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002).

In determining whether a trial court abused its discretion in denying a motion for a mistrial, we examine (1) the seriousness of the irregularity, (2) whether the statement was cumulative of other properly admitted evidence, and (3) whether the irregularity could be cured by an instruction. Perez-Valdez, 172 Wn.2d at 818.

Before trial, defense counsel moved to exclude or redact any photomontage that used an inmate booking photograph of Wade. But in addressing the pretrial motion, the

22

defense suggested the State place a black bar over the clothing in the photomontage. The State agreed.

During trial, Detective Moore testified that he arrested Wade. Detective Moore testified Detective Devore "notified me that they had identified the probable suspect as a man named Gary Wade, and that he had been booked into King County Jail recently prior to that." When asked if he had a photograph to aid him in identifying Wade, Detective Moore replied, "Yes[,] we had a recent booking photo." Wade moved for a mistrial.

Wade argued the testimony was prejudicial. The State argued that any prejudice was minimal because the jury heard testimony that Wade sold drugs to Thornton and others. The court denied the motion for a mistrial, concluding any prejudice could be cured by a jury instruction. The defense asked the State to stipulate that Wade had been caught with an open container in a bus shelter and that the booking photograph related to a misdemeanor drug violation. The State agreed. The following stipulation of the parties was read to the jury:

> The jail booking of Mr. Wade referenced by Detective Moore was a booking on a misdemeanor drug violation after Mr. Wade was contacted by law enforcement in January of 2011 for having an open beverage container in a bus stop. It was unrelated to the investigation of this case.

Wade relies on State v. Escalona, 49 Wn. App. 251, 742 P.2d 190 (1987), to argue the stipulation read to the jury could not cure the irregularity. Escalona is distinguishable.

In Escalona, the victim violated a motion in limine by referring to the prior conviction of the defendant for the same crime. Escalona, 49 Wn. App. at 255. The

victim testified the defendant " 'has a record and had stabbed someone.' " Escalona, 49 Wn. App. at 255. Although the trial court gave a limiting instruction and instructed the jury to disregard the testimony, we concluded the irregularity was "extremely serious" and could not be cured by an instruction to disregard the testimony. Escalona, 49 Wn. App. at 253, 255-56. "[D]espite the court's admonition, it would be extremely difficult, if not impossible, in this close case for the jury to ignore this seemingly relevant fact" and conclude that the defendant "acted on this occasion in conformity with the assaultive character he demonstrated in the past." Escalona, 49 Wn. App. at 256.

By contrast, here, the testimony referring to a booking photograph did not indicate that Wade had a propensity to commit murder or that he had even been previously convicted of a crime. Any prejudice resulting from the reference to the booking photograph was cured by the stipulation that explained the photograph was related to a misdemeanor drug violation. See State v. Condon, 72 Wn. App. 638, 649-50, 865 P.2d 521 (1993). The court did not abuse its discretion in denying Wade's motion for a mistrial.

Cumulative Error

Wade seeks reversal on the grounds of cumulative error. Where, as here, there are few or no errors and the errors, if any, have little or no effect on the outcome of the trial, reversal is not required. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

Comparability of Out-of-State Conviction

In the alternative, Wade argues the court erred in concluding his prior Utah conviction was legally comparable and including the conviction in the calculation of his offender score.

This court reviews a determination of legal comparability de novo. State v. Jackson, 129 Wn. App. 95, 106, 117 P.3d 1182 (2005). Out-of-state prior convictions may count in the offender score if they are comparable to a Washington felony. RCW 9.94A.525(3).

To determine comparability, Washington courts apply a two-part test. State v. Morley, 134 Wn.2d 588, 605, 952 P.2d 167 (1998). Under the legal prong, the court first compares the elements of the out-of-state crime with the relevant Washington crime. If the elements of the out-of-state crime are comparable to those of a Washington offense, then the out-of-state conviction is counted as an equivalent Washington conviction. State v. Jordan, 180 Wn.2d 456, 461, 325 P.3d 181 (2014). However, if the elements of the out-of-state crime are different or broader, the sentencing court determines whether the defendant's conduct would have violated the comparable Washington statute. State v. Olsen, 180 Wn.2d 468, 473, 325 P.3d 187 (2014).

Wade was convicted in Utah of attempt to distribute, offer, or arrange to distribute cocaine in 2006. Wade claims that because the prosecutor conceded the Utah statute defining the crime was broader than the comparable Washington offense, it is not legally comparable. Wade misstates the record.

The prosecutor conceded the Utah statute was "broader than what it is in the VUCSA[8] delivery statute alone," but argued the Utah crime was legally comparable to the Washington crime of "attempted conspiracy to commit a delivery of cocaine." The State asserted that "[t]he statutes for attempt are almost identical in Utah and Washington. They both require intent to commit the crime and a substantial step."

> The attempt is to conspire to deliver drugs. It is odd, I don't dispute that. It's still a crime. And I understand [defense]'s argument, but I think that's wrong. I think the statutes clearly indicate and the case law indicates you can attempt to conspire, and that's exactly what he's saying is broad about it, but that's what you can do in Washington.

Utah Code (UC) 58-37-8 prohibits distribution or consent to distribute a controlled or counterfeit substance. UC 58-37-8(1)(a) states, in pertinent part:

> Except as authorized by this chapter, it is unlawful for any person to knowingly and intentionally:
>
> . . . .
>
> (ii) distribute a controlled or counterfeit substance, or to agree, consent, offer, or arrange to distribute a controlled or counterfeit substance.

Utah's attempt statute, UC 76-4-101, states, in pertinent part:

> (1) For purposes of this part, a person is guilty of an attempt to commit a crime if he:
> (a) engages in conduct constituting a substantial step toward commission of the crime; and
> (b)(i) intends to commit the crime; or
> (ii) when causing a particular result is an element of the crime, he acts with an awareness that his conduct is reasonably certain to cause that result.

Washington prohibits delivery of a controlled substance under RCW 69.50.401. RCW 69.50.401(1) states, "Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance." As to counterfeit substances, RCW 69.50.4011(1) states,

---

[8] Violation of the Uniform Controlled Substances Act, chapter 69.50 RCW.

26

"Except as authorized by this chapter, it is unlawful for any person to create, deliver, or possess a counterfeit substance."

Washington's attempt statute also requires intent to commit the crime plus a substantial step toward its commission. The criminal attempt statute, RCW 9A.28.020(1), states:

> A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime.

Accordingly, distribution of a controlled or counterfeit substance is a crime in both Utah and Washington.

The Utah statute also prohibits a person from agreeing, consenting, offering, or arranging to distribute a controlled or counterfeit substance. UC 58-37-8(1)(a)(ii). A person is guilty of criminal conspiracy in Washington when,

> with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

RCW 9A.28.040(1). Further, RCW 69.50.407 states:

> Any person who attempts or conspires to commit any offense defined in this chapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Therefore, if Wade was convicted under UC 58-37-8(1)(a)(ii) for attempting to "distribute a controlled or counterfeit substance," the crime is legally comparable to an attempt to commit a crime under either RCW 69.50.401 or RCW 69.50.4011, which is a class C felony in Washington. RCW 9A.28.020(3)(c).

27

If Wade was convicted under the Utah statute for attempting to "agree, consent, offer, or arrange to distribute a controlled or counterfeit substance," UC 58-37-8(1)(a)(ii), the crime is legally comparable to the crime of attempted conspiracy to deliver a controlled substance under Washington law, RCW 69.50.407,[9] a class C felony. RCW 69.50.401(2)(a), .4011(2)(a); RCW 9A.28.020(3)(c). Because Wade's Utah conviction is legally comparable to a Washington crime, the court properly counted the Utah conviction in Wade's offender score.

We affirm the jury conviction of murder in the second degree and the judgment and sentence.

WE CONCUR:

---

[9] Attempted conspiracy to commit a crime is recognized as a crime in Washington.

    Solicitation is properly analyzed as an "attempt to conspire." . . . Whereas the actus reus of conspiracy is an agreement with another to commit a specific complete offense, that of solicitation is an attempt to persuade another to commit a specific offense.

State v. Jensen, 164 Wn.2d 943, 951, 195 P.3d 512 (2008) (referring to the "double inchoate crime" of attempt to conspire) (internal citations omitted, emphasis in original).

28