# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the<br>Personal Restraint of | No. 52642-5-II |
| JAMES EDWARD MITCHELL, | UNPUBLISHED OPINION |
| Petitioner. | |

MAXA, C.J. – In this personal restraint petition (PRP), James Mitchell seeks relief from personal restraint imposed following his conviction for the first degree murder of Linda Robinson. Robinson was stabbed to death in her apartment in 1993. The case remained open until 2013, when DNA testing of blood from the scene resulted in a match to Mitchell's DNA profile.

We hold that (1) the trial court did not err in excluding other suspect evidence because the evidence Mitchell would have offered was too speculative to raise doubt about his guilt; (2) the prosecutor's statements during closing argument that Mitchell challenges did not constitute misconduct because they were reasonable inferences from the evidence; (3) the trial court did not violate Mitchell's confrontation right by allowing forensic officers to read their 1993 investigation reports because the officers testified at trial; (4) Mitchell's trial counsel was not ineffective in failing to renew efforts to introduce other suspect evidence, failing to object to the prosecutor's statements in closing arguments, and failing to request a jury instruction regarding

spoliation of evidence; (5) cumulative error did not deprive Mitchell of a fair trial, and (6) Mitchell's appellate counsel did not provide ineffective assistance for failing to raise these issues in his direct appeal.

Accordingly, we deny Mitchell's PRP.

FACTS

In 2015, the State charged Mitchell with first degree murder for the stabbing death of Linda Robinson. *State v. Mitchell*, No. 48810-8-II, slip op. at 2 (Wash. Ct. App. Aug. 29, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2048810-8-II%20Unpublished%20Opinion.pdf, *review denied*, 189 Wn.2d 1041 (2018). Robinson's death had occurred over 20 years earlier, in 1993.

*Robinson's Death and Crime Scene Investigation*

On the night of February 6, 1993, Robinson's young nieces and nephew were spending the night at Robinson's apartment in Spanaway. The children were in the living room. Around 10:30 PM that night, Robinson was talking on the telephone with her friend George Caldwell. Robinson told Caldwell that somebody was at the door. Caldwell heard Robinson talking to another person and said Robinson sounded "submissive," telling the person "okay, okay." Report of Proceedings (RP) (Feb. 4, 2016) at 655. Then the connection went dead.

Around 11:00 PM, the oldest child was awakened by the sound of the apartment's smoke alarm. She went to the kitchen where she saw food burning on the stove and Robinson lying on the kitchen floor surrounded by blood. A neighbor called the police.

The autopsy showed that Robinson had 10 stab wounds in her back. Multiple stab wounds penetrated her chest cavity and punctured her lung and liver, and she had defensive

wounds on her hands and forearms and superficial cuts to her chest and torso. Law enforcement did not find a murder weapon at the scene.

Police officers and forensic investigators searched Robinson's apartment for evidence. and collected blood evidence. There was blood on Robinson and around the kitchen, including a large blood smear on the refrigerator. There was a small smear of blood on the hallway wall across from the bathroom door. There were also blood spatters in front of a nightstand in Robinson's bedroom. The telephone cord, which had been ripped out of the wall, and a jacket from the bedroom appeared to have blood on them.

At the time, none of the evidence was tested for DNA because the science had not yet been developed to allow for DNA analysis of blood.

*Discovery of Bloody Knife and Sawed-Off Shotgun*

On either February 6, the day of Robinson's murder, or February 7, a bloody knife and a sawed-off shotgun were found in Lakewood. The location where the items were found was not near the scene of Robinson's murder. James O'Hern, the detective leading Robinson's murder investigation, noted the discovery in his investigation notebook under a different incident number than the one assigned to Robinson's murder.

A sheriff's office property report noted that the items should be processed for fingerprints and possible blood on the knife blade. It is unclear whether any follow up was done regarding the knife or the shotgun.

*Other Suspect Investigation*

Robinson had been seeing a few men around the time of her death. One of these men was Lee Chandler. Chandler was temporarily separated from his wife and he and Robinson

3

occasionally got together to smoke crack cocaine. They had sex a few times but were primarily just friends.

A few weeks after the murder, Robinson's friend Mark McGruder was interviewed. McGruder occasionally smoked with Robinson and had also lived with Chandler for a time. McGruder stated that Chandler used Robinson as a runner for crack. Robinson and Chandler occasionally loaned each other money for drugs. When Chandler smoked he would become scary and paranoid. But McGruder denied ever seeing Chandler get violent. Chandler and McGruder one time had gotten into a tussle, but McGruder said that Chandler did not try to hurt him.

Investigators interviewed Chandler a few times in connection with Robinson's death. Chandler told investigators that he had been arrested once before for a domestic violence assault against his wife, losing his temper and striking her after witnessing her attempt to buy drugs just after completing a drug treatment program. Chandler also said that he had once assaulted a man staying in his residence during a dispute over payment of an electric bill. Chandler denied any involvement in Robinson's death.

Chandler became the focus of the investigators' attention. He took a voluntary polygraph test, which he failed. The polygraph showed "significant emotional disturbances indicative of deception" in response to the questions regarding his involvement with Robinson's death. PRP, Attach. E at 2.

Because Chandler was involved in illegal drug activity with Robinson, and because he failed the polygraph, he became the number one suspect in O'Hern's mind. Chandler was booked into jail on unrelated warrants after one of the interviews. However, investigators never

obtained any evidence that would allow them to arrest Chandler. Robinson's murder investigation remained unsolved.

*Reopening of Case*

In 2013, another detective reopened Robinson's case and arranged to have the blood evidence tested for DNA. Using a control sample of Robinson's blood from her autopsy, forensic scientists created Robinson's DNA profile. They then tested the blood samples taken from the bedroom, the jacket, the telephone cord, and Robinson's jeans. Several samples contained mixed DNA from both Robinson and an unknown person. Blood found on a bedroom dresser contained DNA that matched the unknown person.

The DNA profile for that the unknown person matched Mitchell's DNA profile. Mitchell was located in Florida, where he was arrested on charges of first degree premediated murder and brought to Washington for trial.

*State's Pretrial Evidentiary Motions*

The State filed pretrial motions to exclude other suspect evidence, admit police reports and property sheets drafted in 1993 by forensic officers, and exclude evidence of the knife and shotgun found near the time of the murder.

The trial court granted the State's motion to exclude other suspect evidence because Mitchell failed to establish a connection between another suspect and the crime that would clearly point to a person other than the defendant as the perpetrator. But the trial court stated that Mitchell could re-litigate the issue based on evidence produced at trial.

Mitchell objected to the testimony of the forensic examiners on hearsay and confrontation clause grounds. The trial court ruled that the police reports and property sheets drafted by

forensic officers were admissible under ER 803(a)(5) as prior recollections recorded, assuming a proper foundation was laid at trial.

Finally, the trial court denied the State's motion to exclude evidence of the knife and the shotgun. The trial court ruled that the evidence was relevant because Robinson was killed with a knife but the knife was never found, gunfire occurred on the night of the murder, the knife and the shotgun were found the day after the murder, there was apparently blood on the knife, and the request to have the knife tested for fingerprints apparently was never satisfied.

*Trial Testimony*

Forensic investigators Hilding Johnson and Ted Schlosser testified regarding their participation in the 1993 investigation of Robinson's murder. Neither investigator independently recalled the crime scene at trial. Both investigators testified by reading directly from their 1993 reports.

After O'Hern testified that he had interviewed many of Robinson's friends and acquaintances after her death but failed to identify a suspect, defense counsel asked the trial court to revisit its ruling on other suspect evidence. The trial court ruled that Mitchell could inquire about the investigation of Chandler.

On cross-examination, O'Hern testified that he interviewed Chandler several times and finally took a taped statement, and that he also interviewed Chandler's wife. And he kept a copy of Chandler's driver's license on top of the file on Robinson's murder until he retired.

The forensic scientist who completed the DNA testing on items from the crime scene testified that blood on the jeans Robinson was wearing when she was found was consistent with both Robinson and Mitchell's DNA profiles. A significant amount of Mitchell's DNA was also

6

on a jacket found in Robinson's apartment and on the telephone cord. Mitchell's DNA also was found in samples from Robinson's bedroom vanity and two envelopes found at the scene.

Mitchell testified at trial that he knew Robinson and had been at her apartment a few times. The last time he was there some kids were asleep in the living room. He said that while he was with Robinson, she answered a knock at the door. An agitated man entered the apartment and tried to hit Robinson and Mitchell. Mitchell said that Robinson tried to get the man to leave and threatened to call the police, but the man stayed and exchanged blows with Mitchell.

According to Mitchell, the man left after Robinson again told him to leave but said that he would be back. Then Mitchell followed Robinson to her bedroom and looked at himself in her dresser mirror. He later noticed that his hand was bleeding. Mitchell left the apartment and did not see Robinson again. He denied killing Robinson.

*Closing Arguments and Verdict*

During closing argument, the prosecutor stated regarding the DNA evidence from the blood samples that Mitchell's blood was mixed with Robinson's blood, "which means they bled at the same time." RP (Feb. 22, 2016) at 1081. The prosecutor repeated several times throughout the remainder of closing argument and rebuttal the idea that the mixed blood samples meant that Mitchell and Robinson bled at the same time.

The prosecutor also stated that Mitchell's testimony "simply isn't believable, and you shouldn't believe it, and the reason you shouldn't believe it is because it's not true." RP (Feb. 22, 2016) at 1096. During rebuttal, the prosecutor told the jury that "What Mr. Mitchell told you was not what actually happened." RP (Feb. 22, 2016) at 1142.

The jury found Mitchell guilty of first degree premeditated murder. Mitchell appealed, and this court affirmed his conviction. He then filed this PRP.

ANALYSIS

A.     PRP PRINCIPLES

We will grant appropriate relief when petitioners establish that they are under restraint that is unlawful for one of certain specified reasons.  RAP 16.4(a)-(c).  To prevail in a PRP, a petitioner must establish (1) a constitutional error that resulted in actual and substantial prejudice, or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice.  *In re Pers. Restraint of Dove*, 196 Wn. App. 148, 154, 381 P.3d 1280 (2016).  The petitioner must make this showing by a preponderance of the evidence.  *Id.*

However, a PRP is not a substitute for a direct appeal, and the availability of collateral relief is limited.  *Id.* at 153.  " 'Relief by way of a collateral challenge to a conviction is extraordinary, and the petitioner must meet a high standard before this court will disturb an otherwise settled judgment.' "  *Id.* (quoting *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011)).

RAP 16.7(a)(2) requires a petitioner to specifically identify the evidence available to support the factual allegations in the PRP.  *In re Pers. Restraint of Wolf*, 196 Wn. App. 496, 503, 384 P.3d 591 (2016).  The petitioner must show that he has competent, admissible evidence to establish facts that would entitle him to relief.  *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013).  Conclusory allegations are insufficient.  *Wolf*, 196 Wn. App. at 503.  In addition, the factual allegations must be based on more than speculation and conjecture.  *Yates*, 177 Wn.2d at 18.

We have three options when considering a PRP.  First, if a petitioner does not show actual prejudice for constitutional errors or a fundamental defect resulting in a miscarriage of justice for nonconstitutional errors, the petition must be dismissed.  *Yates*, 177 Wn.2d at 17.

8

Second, if the petitioner has proved actual prejudice or a fundamental defect resulting in a miscarriage of justice, the court should grant the PRP. *Id.* at 18. Third, if the petitioner makes at least a prima facie showing but the merits of his or her contentions cannot be resolved solely on the record, the court should remand for a full hearing on the merits or a reference hearing. *Id.*

B.       OTHER SUSPECT EVIDENCE

Mitchell claims that the trial court denied his constitutional right to present a defense when the court excluded evidence that investigators suspected Chandler during the initial 1993 investigation. We disagree.[1]

1.    Legal Principles

Other suspect evidence is relevant if that evidence tends to connect someone other than the defendant with the charged crime. *State v. Franklin*, 180 Wn.2d 371, 381, 325 P.3d 159 (2014). Before the trial court may admit other suspect evidence, "some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." *Id.* The evidence must have a "logical connection to the crime." *Id.* However, "[e]vidence establishing nothing more than suspicion that another person might have committed the crime [i]s inadmissible." *Id.* at 380.

The question for admissibility is whether the offered evidence tends to create a reasonable doubt regarding the defendant's guilt; the evidence need not establish the other suspect's guilt beyond a reasonable doubt. *Id.* at 381. In addition, the focus must be on the probative value of the other suspect evidence, not on the strength of the State's case. *Id.* at 378-

---

[1] As a threshold matter, the State argues that Mitchell did not preserve this issue for appeal because the trial court's pretrial ruling on other suspect evidence was tentative, leaving Mitchell free to raise the issue later during trial. We reject this argument because the trial court's pretrial ruling was not tentative.

Other suspect evidence can have a logical connection to the issues in the case even if the State's evidence strongly supports the defendant's guilt. *Id.* at 382.

We review a trial court's exclusion of other suspect evidence for an abuse of discretion. *State v. Wade*, 186 Wn. App. 749, 765, 346 P.3d 838 (2015).

2.    Analysis

Mitchell identifies extensive other suspect evidence that he would have presented but for the trial court's exclusion of such evidence:

(1) Robinson and Chandler smoked crack together and had sex a few times in the months prior to Robinson's death when Chandler was separated from his wife;

(2) Chandler used Robinson as a "runner" for crack;

(3) Chandler was known as being violent with dealers;

(4) Chandler offered to pay Robinson for sex;

(5) Chandler owed Robinson money;

(6) Chandler was the focus of investigators' attention;

(7) O'Hern believed that Chandler, of all those interviewed, was most likely involved with Robinson's death;

(8) Chandler was the number one suspect in O'Hern's mind because he was supplying Robinson with dope and could be violent with suppliers;

(9) Chandler would get scary and paranoid when he smoked crack;

(10) Chandler would be violent toward McGruder when Chandler perceived McGruder getting in the way of Chandler's having a sexual relationship with Robinson;

(11) Chandler and Robinson borrowed money from each other to buy drugs; and

(12) Chandler knew the location of Robinson's new apartment and the two had been recently spending time together there.

But further investigation failed to uncover any evidence connecting Chandler to the murder. Chandler repeatedly denied having anything to do with Robinson's death, and there was no evidence that he had ever been violent toward her. Although Chandler knew the location of Robinson's new apartment, there was no evidence showing that Chandler was at or near the apartment on the night of the murder. Chandler told investigators that the last time he had seen or spoken to Robinson was roughly three weeks before the murder. And none of the extensive blood evidence that was tested in 2013 implicated Chandler.

In addition, some of the evidence on which Mitchell relies would have been inadmissible at trial. McGruder died in 2010, a few years before trial. Anything he told law enforcement would have been hearsay. *See* ER 802, 804(b) (no applicable hearsay exception based on McGruder's unavailability). And polygraph test results generally are inadmissible and cannot be introduced as other suspect evidence. *State v. Thomas*, 150 Wn.2d 821, 860, 83 P.3d 970 (2004).

We conclude that evidence of O'Hern's suspicions about Chandler were not enough to raise a reasonable doubt about whether Mitchell killed Robinson because there was no nonspeculative link between Chandler and the charged crime. Accordingly, we hold that the trial court did not abuse its discretion in excluding evidence that Chandler was a suspect.

C.      PROSECUTORIAL MISCONDUCT

Mitchell argues that prosecutorial misconduct deprived him of a fair trial because the prosecutor's statements during closing argument and rebuttal improperly (1) stated facts not in evidence by telling the jury that Mitchell and Robinson bled at the same time, and (2) expressed a personal opinion about the credibility of Mitchell's testimony. We disagree.

1. Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). In assessing whether a prosecutor's closing argument was improper, we recognize that the prosecutor has "wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses." *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). However, it is improper for the prosecutor to argue facts that are not in evidence. *Glasmann*, 175 Wn.2d at 704-05.

To establish prejudice, the defendant must show a substantial likelihood that the misconduct affected the jury verdict. *Thorgerson*, 172 Wn.2d at 442-43. When analyzing prejudice, we do not look at the alleged improper remarks "in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

When the defendant fails to object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). The defendant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Id.* at 761.

2. Arguing that Mitchell and Robinson Bled at the Same Time

During closing argument, the prosecutor stated

He [Mitchell] was there – he was there that night, and he bled that night; and he didn't just bleed a little bit, and he didn't just bleed in one place. He bled far and wide in that apartment, and his blood was mixed with hers *which means they bled at the same time*.

RP (Feb. 22, 2016) at 1081 (emphasis added).  The prosecutor stated that the fact that Mitchell's

blood was found on Robinson's jeans and on a jacket in her apartment was significant because it

was "transfer blood from touching."  RP (Feb. 22, 2016) at 1087-88.  The prosecutor argued that

> If you've just murdered somebody with, what, twelve, fourteen stab wounds, your hands are going to be bloody with your blood and her blood; so it's significant that the blood on the jacket is both transfer blood and mixed blood because it shows not only did Mr. Mitchell bleed there that night, *he bled at the same time as Linda*; and the reason that he bled at the same time as Linda is that he murdered Linda with a knife.

RP (Feb. 22, 2016) at 1088 (emphasis added).  The prosecutor continued later on that

> We know that [Mitchell] got cut because he bled, *and he bled at the exact same time that she did*, and we know when she bled.  She bled when she was murdered. *He bled at the same time because he was the murderer*, and he left his blood in the bedroom and on the phone cord and on the back of Linda Robinson's pants.

RP (Feb. 22, 2016) at 1100 (emphasis added).  Finally, the prosecutor argued that, though

memories faded over time and could be biased, DNA evidence was more objective.

> [T]he DNA of the killer[,] and we know it's the killer because of where it was deposited away from the body, on the back of the body, in the bedroom, how it was deposited, . . . [,] and when it was deposited, the same time that Linda Robinson bled, mixed with her blood.  *She bled that night when she was murdered, and Mr. Mitchell's blood mixed with hers because he's the one who murdered her*.

RP (Feb. 22, 2016) at 1143-44 (emphasis added).  Defense counsel did not object to any of these

arguments.

Mitchell emphasizes that no witness testified that the presence of mixed DNA in a blood

sample proves that the two people bled at the same time or that recently dried blood cannot mix

with fresh blood.  He claims that because this was a technical scientific matter beyond the

common knowledge of jurors, expert testimony would have been required to establish that blood

containing mixed DNA meant that two people bled at the same time.  Mitchell argues that in the

absence of such evidence, the prosecutor's statements were improper.

Whether the presence of mixed DNA in a blood sample means that two people bled at the same time certainly could be the subject of expert testimony. But it also is reasonable to infer that two people bled at the same time when their DNA is mixed in a blood sample. Here, the evidence showed that there was blood in multiple locations and there was an indication that Robinson and her attacker struggled. The prosecutor made a reasonable inference from the evidence that in the course of a struggle, both Robinson and Mitchell were cut and bled at the same time.

We hold that these arguments were not improper and did not constitute prosecutorial misconduct.

3.    Personal Opinion that Mitchell's Testimony was not Credible

During closing argument, the prosecutor stated, "So, Mr. Mitchell's testimony isn't consistent with itself. It's shifted around. It isn't consistent with what other witnesses told you, and it simply isn't believable, and you shouldn't believe it, and the reason you shouldn't believe it is because it's not true." RP (Feb. 22, 2016) at 1096. During rebuttal, the prosecutor stated that "[w]hat Mr. Mitchell told you was not what actually happened." RP (Feb. 22, 2016) at 1142.

Mitchell argues that the prosecutor impermissibly expressed a personal opinion as to Mitchell's credibility when the prosecutor stated that Mitchell had lied during his testimony.

A prosecutor cannot express a personal opinion regarding a witness's credibility or the defendant's guilt. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). However, a prosecutor may argue that the defendant is not telling the truth if the prosecutor refers to specific evidence, including the defendant's own testimony, that supports an argument that the defendant has lied. *State v. Copeland*, 130 Wn.2d 244, 291, 922 P.2d 1304 (1996). This holding is

consistent with the prosecutor's latitude to draw and express reasonable inferences from the evidence. *Id*. at 290-91.

The prosecutor's remarks here were an explanation of the evidence rather than an attempt to give the jury a personal opinion on Mitchell's credibility or guilt. Mitchell's testimony about being in Robinson's apartment on the night she was murdered was inconsistent with most of the other evidence offered at trial. As a result, the prosecutor's argument that Mitchell's testimony was not believable was based on the evidence rather than on his personal opinion.

In addition, defense counsel failed to object to these statements at trial, and Mitchell has not established that these remarks were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61.

We hold that these arguments were not improper and did not constitute prosecutorial misconduct.

D.     CONFRONTATION RIGHT

Mitchell argues that the trial court's ruling under ER 803(a)(5) allowing investigating officers Johnson and Schlosser to read from their 1993 reports violated his right to confront witnesses against him because they had no independent recollection of their investigation of Robinson's death. We disagree.

1.     Legal Principles

Under ER 803(a)(5),

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly [is not excluded by the hearsay rule]. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

15

The issue here is whether admission of testimony under this rule violated Mitchell's confrontation rights.

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, accused persons have the right to confront the witnesses against them. The confrontation clauses in both constitutions provide the same right of defendants to confront witnesses. *State v. Lui*, 179 Wn.2d 457, 468-70, 315 P.3d 493 (2014). As a result, we analyze a defendant's right to confront witnesses under the Sixth Amendment. *Id.* at 470. We review confrontation clause challenges de novo. *State v. Burke*, 6 Wn. App. 2d 950, 964, 431 P.3d 1109 (2018).

The confrontation right applies to witnesses, and a witness is a person who gives testimony. *Lui*, 179 Wn.2d at 480 (citing *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). Therefore, the confrontation clause generally bars the admission of "testimonial statements" made by a nontestifying witness. *State v. Jasper*, 174 Wn.2d 96, 109, 271 P.3d 876 (2012) (citing *Crawford*, 541 U.S. at 68). In *Crawford*, the Court determined that when out-of-court testimonial statements were at issue, the only way to ensure the reliability of the statement is an in-court confrontation of the witness. 541 U.S. at 68-69. Accordingly, the Court held that out-of-court testimonial statements were inadmissible unless the defendant had a prior opportunity to cross-examine the out-of-court speaker. *Id.*

2.   Analysis

At trial, Johnson and Schlosser testified regarding their participation in the 1993 investigation of Robinson's murder. Neither investigator independently recalled the crime scene at trial. Both investigators testified by reading directly from their 1993 reports. Mitchell argues that because the officers testified that they had no independent recollection of their investigation

of the crime scene, they did not testify in a manner sufficient to satisfy the confrontation clause and the trial court therefore erred in allowing them to read their reports to the jury.

In *State v. Thach*, the defendant argued that *Crawford* impacted the admissibility of a prior inconsistent statement under ER 801(d)(1)(i). 126 Wn. App. 297, 309, 106 P.3d 782 (2005). This court held that *Crawford* had no bearing on the admissibility of the statement under ER 801(d)(1)(i) because in *Crawford* the Court stated that "the confrontation clause is not implicated when the declarant is available for cross-examination at trial." *Thach*, 126 Wn. App. at 309. The Court in *Crawford* recognized this distinction: "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." 541 U.S. at 59 n.9.

In *State v. Price*, our Supreme Court held that admission of a child's out-of-court statements did not violate the confrontation clause when the child testified at trial, even though she did not remember the events at issue or making the statements. 158 Wn.2d 630, 650, 146 P.3d 1183 (2006). The court emphasized that because the child testified at trial, she confronted the defendant face to face and the jury was able to evaluate her demeanor and her testimony. *Id.* The court concluded that "a witness's inability to remember does not implicate *Crawford* nor foreclose admission of pretrial statements." *Id.*

Mitchell contends that *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) compels a different result. In *Melendez-Diaz*, the Court held that the affidavits of state laboratory analysts identifying material seized by the police as cocaine were testimonial statements and the analysts were "witnesses" for purposes of the Sixth Amendment. *Id.* at 311. Mitchell argues that because the forensic reports here were also testimonial

17

statements, prepared for the primary purpose of investigating and prosecuting a crime, the trial court erred in allowing Johnson and Schlosser to read their reports into evidence without any independent recollection of the investigation.

Mitchell's argument appears to conflate a witness's lack of memory with unavailability. However, neither *Crawford* nor *Melendez-Diaz* hold that the confrontation clause requires testifying witnesses to have a certain level of recall before their prior statements can be admitted. Here, Mitchell was afforded an opportunity to confront Johnson and Schlosser at trial because they were present to testify. Their lack of independent memory does not affect the admissibility of their testimony. *See Price*, 158 Wn.2d at 650.

We hold that allowing the officers to read from their reports under ER 803(a)(5) did not implicate Mitchell's rights under the confrontation clause.

E.      INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Mitchell argues that defense counsel provided ineffective assistance for failing to (1) renew efforts to introduce other suspect evidence, (2) object to the prosecutor's statements in closing argument and rebuttal, and (3) request a spoliation instruction. We disagree.

1.      Legal Principles

Ineffective assistance of counsel is a constitutional error, arising from the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *Id.* at 457-58. Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id.* at 458. Prejudice exists if there is a reasonable

probability that, except for counsel's errors, the result of the proceeding would have been different. *Id.*

We apply a strong presumption that defense counsel's performance was reasonable. *Id.* Counsel's conduct is not deficient if it was based on what can be characterized as legitimate trial strategy or tactics. *Id.* To rebut the strong presumption that counsel's performance was effective, "the defendant bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.' " *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

The "reasonable probability" standard for prejudice in an ineffective assistance of counsel claim on direct appeal is not precisely the same as the "actual and substantial prejudice" standard in a PRP. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 842, 280 P.3d 1102 (2012). However, a petitioner who presents a successful ineffective assistance of counsel claim necessarily establishes actual and substantial prejudice for purposes of collateral relief. *Id.* at 846-47.

2. Failure to Re-Litigate Admission of Other Suspect Evidence

Mitchell argues his trial counsel was ineffective for failing to renew efforts to introduce other suspect evidence implicating Chandler after Mitchell testified that another man started a fight with him in Robinson's apartment.

Here, the trial court granted the State's motion to exclude other suspect evidence, but stated that Mitchell could re-litigate the issue based on evidence produced at trial. Defense counsel did in fact ask the trial court to revisit its ruling after O'Hern testified that he had interviewed many of Robinson's friends and acquaintances after her death but had failed to

19

identify a suspect. The court ruled that Mitchell was allowed to question O'Hern about his investigation of Chandler.

On cross-examination, O'Hern testified that he interviewed Chandler several times and finally took a taped statement, and that he also interviewed Chandler's wife. And he kept a copy of Chandler's driver's license on top of Robinson's file until he retired.

Mitchell contends that defense counsel should have raised the issue again after his own testimony that on the last night he saw Robinson at her apartment, a man arrived and started a fight with him. He apparently claims that the man could have been Chandler. However, Mitchell has not shown that the trial court would have admitted any additional other suspect evidence. As discussed above, the additional evidence Mitchell references does not show a nonspeculative link between Chandler and the crime.

Regarding the second prong of an ineffective assistance analysis, Mitchell fails to show a reasonable probability that the outcome of the trial would have been different had the other suspect evidence been admitted. As noted above, defense counsel did elicit evidence that Chandler was a suspect. There is no indication that additional evidence would have affected the outcome of the trial.

In addition, there was significant DNA evidence implicating Mitchell at trial – his blood was identified on the jeans Robinson was wearing when she was found, on a jacket in her apartment, in her bathroom, and on the telephone cord that had been ripped out of the wall. And Mitchell's own testimony seemed to place him at Robinson's apartment on the night she died. Even if more extensive evidence about Chandler as a possible suspect was admitted, there is no indication that the jury would have ignored the strong evidence that Mitchell had killed Robinson.

Accordingly, we hold that Mitchell's ineffective assistance of trial counsel claim fails on this basis.

3.   Failure to Object to Prosecutor's Comments in Closing and Rebuttal

Mitchell argues that he received ineffective assistance of trial counsel based on counsel's failure to object to the statements the prosecutor made during closing argument and rebuttal regarding the prosecutor's inference that Robinson and Mitchell bled at the same time and that Mitchell's testimony was not credible.

As discussed above, these comments were not improper.  And "[t]he decision of when or whether to object is a classic example of trial tactics," and rarely constitutes a failure of counsel justifying reversal.  *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989).  Therefore, we hold that trial counsel was not ineffective for failing to object to these comments.

4.   Failure to Request Spoliation Instruction

Mitchell argues his trial counsel was ineffective for failing to request a spoliation instruction regarding the bloody knife and sawed-off shot gun found near the time of Robinson's death.

To prevail, Mitchell must show that the trial court would likely have given a spoliation instruction had his counsel requested it.  *See State v. Classen*, 4 Wn. App. 2d 520, 536, 422 P.3d 489 (2018).  In general, criminal defendants are entitled to a jury instruction on their theory of the case.  *State v. Henderson*, 192 Wn.2d 508, 512, 430 P.3d 637 (2018).  Jury instructions are sufficient if, viewed as a whole, they allow the defendant to argue his or her theory of the case and accurately inform the jury of the applicable law.  *Id.*

"Spoliation is the intentional destruction of evidence."  *Tavai v. Walmart Stores, Inc.*, 176 Wn. App. 122, 134, 308 P.3d 811 (2013).  In determining whether to give a requested spoliation

jury instruction, we consider "the potential importance or relevance of the missing evidence" and "the culpability or fault of the adverse party." *Id.* at 135. The importance of the missing evidence depends on the facts of each case. *Id.* Regarding culpability, we consider whether the party has an innocent explanation for the missing evidence or whether the party's bad faith or conscious disregard led to the loss of the evidence. *Id.* Further, we consider if the party violated some duty to preserve the evidence. *Id.*

Here, O'Hern testified that he made a notation dated February 16, 1993 in his investigation notebook about the knife and shotgun, but under a different case number than the one assigned to Robinson's murder. O'Hern was working on two or three homicide investigations during this time period.

A property report indicated that the knife and gun were found at an address in Lakewood between February 6th and 7th, which O'Hern testified was not near the location of Robinson's murder. When shown a map depicting a route from Robinson's Spanaway apartment to the address where the items were found (near a military base), O'Hern was unsure whether this route was actually passable in 1993. The property report requested that the items be processed for fingerprints and possible blood on the knife blade. O'Hern could not recall whether any follow up was done regarding the knife or the shotgun.

The potential importance or relevance of the knife and shotgun to Robinson's murder was highly speculative. O'Hern's notes indicated that the items were linked with a separate criminal investigation, and when interviewed before trial by defense counsel, he stated he believed they were actually obtained in connection with an assault in Lakewood. The items were found by an apartment manager at an address not near Robinson's apartment in Spanaway where the murder

occurred. The route suggested by defense counsel at trial between Robinson's apartment and the location where the items were found may not have been passible in 1993.

In addition, Mitchell has not provided any evidence that the State's bad faith or conscious disregard caused the knife and shotgun to be destroyed. At most, Mitchell established that a request was made to test the items for forensic evidence but that no results were available at the time of trial. Even if this was negligence on the part of the sheriff's department, "a party's negligent failure to preserve evidence relevant to foreseeable litigation is not sanctionable spoliation." *Cook v. Tarbert Logging, Inc.*, 190 Wn. App. 448, 464, 360 P.3d 855 (2015).

Accordingly, we hold that trial counsel was not ineffective on this basis because the trial court was unlikely to have given a spoliation instruction had it been requested.

F.    CUMULATIVE ERROR

Mitchell argues that cumulative error, including evidentiary and instructional errors as well as prosecutorial misconduct and ineffective assistance of counsel, denied him a fair trial. Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Here, Mitchell has not demonstrated that any error denied him a fair trial. Therefore, we hold that the cumulative error doctrine is inapplicable.

G.    INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Mitchell argues his appellate counsel was ineffective for failing to argue in his direct appeal that (1) the trial court erred in excluding other suspect evidence, (2) the prosecutor's comments during closing argument and rebuttal constituted misconduct, (3) the trial court erred in allowing forensic officers to read from their 1993 reports during testimony, (4) Mitchell

received ineffective assistance of trial counsel, and (5) cumulative error deprived Mitchell of a fair trial.

Here, Mitchell has not demonstrated that any of the errors raised in his PRP have merit. Therefore, we hold that Mitchell did not receive ineffective assistance of appellate counsel on these grounds.

CONCLUSION

We deny Mitchell's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, C.J.

We concur:

LEE, J.

SUTTON, J.