# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58510-3-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ERIC CHARLES BANFIELD, | |
| Appellant. | |

CHE, J. — Eric Banfield appeals his convictions for residential burglary, felony violation of a court order, and misdemeanor violation of a court order, all as crimes of domestic violence designation.

A no-contact order protected Kimberly Curtis from Banfield. Curtis's neighbor witnessed Banfield shoving Curtis into an apartment stair railing. When officers arrived, they heard a male voice in Curtis's apartment and received her permission to search her residence. An officer opened a wallet and saw Banfield's identification card. Eventually, they found Banfield in a locked storage closet on Curtis's balcony.

Banfield objected to several continuances leading up to his trial, which occurred 23 months later. At trial, Curtis testified that she was sure Banfield caused her head to hurt "[b]ecause it happened quite often." Based on that statement, Banfield moved for a mistrial, which the trial court denied. Banfield's counsel cross-examined only one of the State's six witnesses. A jury found Banfield guilty of all charges.

No. 58510-3-II

Banfield argues (1) the trial court abused its discretion by denying a motion for mistrial following Curtis's testimony because it should have been excluded under Evidence Rule (ER) 404(b), (2) he received ineffective assistance of counsel because his counsel did not subject the State's case to meaningful adversarial testing and did not move to suppress evidence obtained from the warrantless search of his wallet, and (3) the trial court violated his right to a speedy trial because of the 23-month delay to his trial. Banfield also requests we strike the crime victim penalty assessment (VPA) and domestic violence assessment (DVA) fees.

We hold (1) the trial court did not err in denying Banfield's motion for mistrial based on Curtis's testimony, (2) Banfield fails to demonstrate that he was denied the effective assistance of counsel, and (3) the trial court did not violate Banfield's right to a speedy trial under the United States and Washington Constitutions. Furthermore, we remand to the trial court to evaluate indigency under the statutory definition and consider whether to impose the VPA fee, and to strike the DVA fee.

We affirm Banfield's conviction but remand to the trial court to consider whether to impose the VPA fee under RCW 10.01.160(3) and to strike the DVA fee.

FACTS

BACKGROUND

Banfield and Curtis dated for about ten years and had a "stormy" relationship. Rep. of Proc. (RP) at 220. In March 2020, the Kelso Municipal Court entered a pretrial "Domestic Violence No-Contact Order" prohibiting Banfield from, among other things, (1) causing, attempting, or threatening to assault or cause bodily injury to Curtis, (2) contacting Curtis, and

(3) knowingly entering, remaining, or coming within 1,000 feet of Curtis's residence.[1]  Clerk's Papers (CP), Pl's Ex. 1, PDF at 190-92.  It remained in effect until the Kelso Municipal Court case concluded.  The no-contact order stated, "Based upon the record . . . the court finds that [Banfield] has been charged with, arrested for, or convicted of a domestic violence offense, that the defendant represents a credible threat to the physical safety of [Curtis], and the court issues this Domestic Violence No-Contact Order . . . to prevent possible recurrence of violence."  CP, Pl's Ex. 1, PDF at 191.

In August 2020, Curtis's neighbor called the police after Curtis knocked on her door asking for someone to call for help.  The neighbor saw Banfield "shov[ing]" Curtis into an apartment stair railing, which looked painful because she saw Curtis rubbing her arm.  RP at 217.  Police officers Austin Foley, Shayda Panah, and John Dahlke responded to the neighbor's call.  Officer Foley had previously responded to Curtis's apartment and learned of a no-contact order between Curtis and Banfield.  The officers confirmed there was an active no-contact order in place.  Officer Foley heard "a distinct male voice" inside Curtis's apartment.  RP at 238.  Officer Panah heard two voices arguing and the male voice sternly saying, "You called the f[***]ing cops."  RP at 254.

The officers announced their presence and after several minutes of knocking on Curtis's door, Curtis answered.  She was upset, crying, shaking, and appeared intoxicated.  The officers noticed marks on Curtis's face, one under each of her eyes and blood on her lip.  Curtis gave the officers permission to search her apartment.  Officer Panah asked Curtis if she was by herself

---

[1] The trial court admitted the no-contact order as an exhibit at trial.

and she responded that Banfield was in the apartment with her. Curtis also told Officer Panah that she was in "so much pain and that she got hit so hard." RP at 258.

During their initial search of the apartment, the officers found duffel bags with men's clothing, men's shoes, and a men's wallet. Officer Panah asked Curtis who the wallet belonged to and she said it was Banfield's. Officer Panah looked inside the wallet and found Banfield's Washington identification card. The officers did not find any other occupant but noted a locked storage closet on the balcony of Curtis's second story apartment. When they knocked on the locked door, Officer Dahlke heard "some rattling in the door" "like someone bumped it." RP at 268-69. Officer Foley visually surveyed the grass underneath the balcony for footprints or disturbances to determine if someone had jumped off the balcony, but he did not find any.

Curtis gave the officers permission to open the locked storage closet door. While Officer Panah was speaking with Curtis, Officers Foley and Dahlke attempted to open and search the locked storage closet. The officers announced their presence multiple times, and eventually, Officer Dahlke used a knife to open the door. They found Banfield, dressed only in shorts, sitting in the closet, and advised him that he was under arrest. Banfield was unresponsive to the officers' directions.

The State charged Banfield with residential burglary, felony violation of a court order, and misdemeanor violation of a court order, all as crimes of domestic violence.

PROCEDURAL HISTORY

Banfield appeared in custody for his preliminary appearance on August 17, 2020. At his arraignment on August 27, he appeared out of custody, and the trial court set his trial date for

December 15, 2020.[2] Prior to December 15, the court reset the trial date to March 9, 2021,

because of the COVID-19 pandemic.[3] Banfield objected to the COVID-19 related continuance

and to the tolling of his right to a speedy trial. Banfield's counsel informed the court that

Banfield would receive new counsel in January 2021 because he would be on paternity leave.

At the readiness hearing on March 2, 2021, Banfield's counsel, through stand-in counsel,

requested a continuance presumably because Banfield's counsel was going on approved leave.

*See* RP at 16. The court reset the trial date to June 8.

On June 1, the State requested a continuance because two material witnesses were

unavailable for trial due to medical issues and family medical leave. The court determined there

was good cause for a continuance. On June 10, the court reset the trial date to July 13.

On July 1, Banfield's counsel informed the court that a conflict of interest existed and

requested the court to assign new counsel to Banfield's cases. The court granted Banfield's

counsel's request to withdraw. Banfield objected to the tolling of his right to a speedy trial.

On July 8, Banfield appeared with new counsel, and the court reset the trial date to

September 13. Banfield objected to the appointment of new counsel because, while he filed a

---

[2] Banfield remained out of custody on this matter. Banfield was in custody on a different matter for a period during the pendency of this matter.

[3] Before and during Banfield's case, the Cowlitz County Superior Court entered a series of emergency orders, which, among other things, suspended or struck and continued criminal jury trials "due to the serious danger posed by [COVID-19] which is an unavoidable circumstance." The Washington Supreme Court issued similar orders during this time. CP at 193 (ord. #1), 237 (ord. #2), 252 (ord. #1-A), 327 (ord. #2-A), 343 (ord. #3-A); *see also* CP at 348-99 (ord. #4-A, 5-A, 6-A, 6-A.1, 6-A.2, 6-A.3, 6-A.4, 6-A.5).

bar grievance against his former counsel, he did not believe a conflict existed and was ready to proceed to trial.

At a hearing on September 7, Banfield's counsel requested a continuance due to the cessation of jury trials in response to COVID-19. The court determined there was good cause to continue the trial to November 30 because the court had suspended jury trials for the month of September in light of growing concerns about the COVID-19 pandemic.

At a hearing on November 23, the court reset the trial date to December 2. Banfield failed to appear for trial on December 2 because he was experiencing health issues. The court found good cause to continue the trial to December 9.

On December 9, the court arraigned Banfield on an amended information. The court reset the trial date to February 8, 2022. Banfield objected to the tolling of his right to a speedy trial.

At a hearing on February 1, 2022, the court determined there was good cause for a continuance due to the COVID-19 pandemic and reset the trial date to April 19.

On April 19, the court found good cause to continue the trial because the court did not have an available courtroom to hear Banfield's case that week. On April 21, the court set a readiness hearing for May 3 and trial for May 10.

On May 3, Banfield failed to appear at his readiness hearing. The court noted the failure to appear and struck the trial.

On May 12, Banfield appeared and the court reset the trial date to June 28.

On June 28, the State requested a continuance because a material witness and her children tested positive for COVID-19. The court found good cause to continue the trial date to July 26. Banfield objected to the continuance.

Trial began on July 26, 2022.

### MOTIONS IN LIMINE

The State moved to admit Curtis's out-of-court statements to Officer Panah that her "head hurts so bad" and "[Banfield] hits so hard" as excited utterances. RP at 197. Banfield moved to exclude any reference "coming from whatever witness that the State would be presenting" to prior or subsequent domestic violence incidents under ER 404(b).[4] RP at 199. Both parties' arguments focused on law enforcement testimony and did not include any discussion of Curtis's testimony.

The trial court ruled that law enforcement could testify that they were aware of the no-contact order and that they "ha[d] responded [to Curtis's residence] before" but stated they could not specify how many times they had responded to Curtis's residence in the past. RP at 204. The court asked the parties if there was "[a]nything else that [they] need[ed] to discuss or deal with" and no party raised issues with Curtis's testimony. RP at 204.

### TRIAL AND MOTION FOR MISTRIAL

At trial, the witnesses testified consistently with the facts above. Additionally, Curtis testified to the following:

---

[4] Under ER 404(b), evidence of other crimes, acts, or wrongs is inadmissible to prove a person's character in order to show that their actions conform with their character. In other words, character evidence is generally inadmissible for the purpose of showing a person's propensity to commit a crime.

7

| [PROSECUTOR] | What did you say to law enforcement? |
| [CURTIS] | I said my head hurt. |
| [PROSECUTOR] | Did you say why your head hurt? |
| [CURTIS] | I don't recall. |
| [PROSECUTOR] | Do you know why your head hurt? |
| [CURTIS] | I'm sure it was from [Banfield]. |
| [PROSECUTOR] | Why are you sure that was from [Banfield]? |
| [CURTIS] | Because it happened quite often. |
| [PROSECUTOR] | But in this instance, did it happen then? |
| [CURTIS] | Yes. |

RP at 224-25.

Banfield objected to Curtis's testimony because the trial court's ruling on the parties' motions in limine allowed law enforcement to testify that they had responded to Curtis's apartment on at least one prior occasion and did not permit any further testimony about domestic violence on any other occasion. The State argued that Curtis's answer was nonresponsive and that it had quickly moved on "to not draw attention to that specific answer." RP at 226.

Banfield did not dispute that it was a nonresponsive answer but moved for a mistrial, stating that Curtis's response could not be addressed by a curative instruction because it would "just underscore" Curtis's testimony. RP at 227. The trial court denied the motion, stating that it did not think there was any intention by the State to elicit information not permitted by the motions in limine; that the State quickly moved on after Curtis's response; and that the jury was already aware that there was a no-contact order in place. Banfield declined a curative instruction because he believed it would draw more attention to Curtis's testimony.

Of the State's six witnesses, Banfield's counsel cross-examined one witness and did not call any witnesses.

SENTENCING

A jury found Banfield guilty of residential burglary, felony violation of a court order, and misdemeanor violation of a court order, all as crimes of domestic violence. The trial court stated that it would "impose the mandatory minimum financial obligations, [and] waive anything that[] [was] not mandatory." RP at 388.

Banfield appeals.

ANALYSIS

Banfield argues (1) the trial court abused its discretion by denying a motion for mistrial following Curtis's testimony because it should have been excluded under ER 404(b), (2) he received ineffective assistance of counsel because his counsel did not subject the State's case to meaningful adversarial testing and did not move to suppress evidence obtained from the warrantless search of his wallet, and (3) the court violated his right to a speedy trial because of the 23-month delay to his trial. Banfield also requests we strike the VPA and DVA fees.

I. MOTION FOR MISTRIAL

Banfield argues the trial court erred when it denied his motion for a mistrial after Curtis testified that she was sure Banfield caused her head to hurt "[b]ecause it happened quite often." RP at 224. Banfield contends that Curtis's testimony was highly prejudicial such that he did not get a fair trial. We disagree.

A.    *Legal Principles*

When it affirmatively appears that a criminal defendant's substantial right was materially affected, the trial court may grant the defendant's motion for a new trial based on several grounds, including an irregularity in the court proceedings that prevented the defendant from

9

having a fair trial. CrR 7.5(a)(5). While the decision to grant a new trial is discretionary, a new trial is required when there has been a prejudicial irregularity that cannot be remedied, such that "'nothing short of a new trial can insure that the defendant will be tried fairly.'" *State v. Lupastean*, 200 Wn.2d 26, 36, 513 P.3d 781 (2022) (quoting *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010)).

We review the trial court's denial of a motion for mistrial for abuse of discretion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). A trial court abuses its discretion in denying a motion for mistrial only when "'no reasonable judge would have reached the same conclusion.'" *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (quoting *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 667, 771 P.2d 711 (1989)).

Trial courts have broad discretion to rule on irregularities during trial. *State v. Wade*, 186 Wn. App. 749, 773, 346 P.3d 838 (2015). They are in the best position to determine whether an irregularity caused prejudice. *Id*. An irregularity is prejudicial only if it affected the outcome of the trial. *Hopson*, 113 Wn. 2d at 284.

When a trial irregularity has occurred, we determine its prejudicial effect by considering (1) the seriousness of the claimed irregularity, (2) whether the irregularity was cumulative of other properly admitted evidence, and (3) whether it could have been cured with an instruction. *Wade*, 186 Wn. App. at 773. Courts have found serious irregularities where, for example, a party purposely violates a pretrial order or where the jury is exposed to inherently prejudicial inadmissible testimony. *Gamble*, 168 Wn.2d at 178; *see also State v. Escalona*, 49 Wn. App. 251, 255-56, 742 P.2d 190 (1987). We reverse the trial court's decision only if it is substantially likely that the irregularity affected the jury's verdict. *Wade*, 186 Wn. App. at 773.

B.      *Curtis's Testimony Does Not Warrant a Mistrial*

First, we consider the seriousness of the claimed irregularity. Banfield contends Curtis's testimony violated the trial court's ruling on a motion in limine because it was evidence of prior crimes, which implied Banfield had the propensity to commit the crimes charged. We disagree.

Banfield relies on *State v. Escalona*, 49 Wn. App. 251, 742 P.2d 190 (1987), for his contention that Curtis's testimony warrants a mistrial, but his reliance is misplaced. In that case, the trial court granted the defense's motion in limine to exclude any reference to the defendant's prior conviction for the same crime, second degree assault while armed with a deadly weapon, a knife. *Id.* at 252. At trial, a witness testified that the defendant "already has a record and had stabbed someone [before]." *Id.* at 253. The trial court denied defense counsel's motion for a mistrial. *Id.* Division One of this court reversed, holding that the trial court abused its discretion in denying the motion for a mistrial. *Id.* at 257. The court concluded the testimony was an "extremely serious" irregularity because it was evidence of prior crimes, which is barred by ER 404(b). *Id.* at 255. The court also noted that the testimony was particularly serious because of the scarcity of evidence against the defendant. *Id.* at 255-56.

Unlike the unfairly prejudicial testimony in *Escalona*, Curtis's testimony that she was sure that Banfield caused her head to hurt "[b]ecause it happened quite often" does not warrant a mistrial. RP at 224. First, it is unclear whether Curtis's testimony violated the trial court's pretrial ruling because the ruling was ambiguous. While Banfield's pretrial motion appeared to include all of the State's witnesses, the court ruled only that law enforcement could not specify how many times they had responded to Curtis's residence in the past. After discussing law enforcement testimony, the trial court asked if there were other matters to discuss, and Banfield

11

did not mention Curtis's testimony or seek a ruling specifically limiting Curtis's testimony. Therefore, it is unclear whether the trial court's ruling on Banfield's motion in limine actually precluded Curtis's testimony.

But even if we agreed that Curtis's testimony violated the trial court's pretrial ruling, that irregularity was not serious and had no prejudicial effect given the weight of the evidence against Banfield. A witness saw Banfield shove Curtis into a stair railing before the witness called the police, officers found Banfield dressed only in shorts in a locked closet on the balcony of Curtis's apartment, officers found duffel bags with men's clothing and shoes in Curtis's apartment, and Curtis told an officer that Banfield was inside the apartment. Thus, this factor does not weigh in favor of a mistrial.

Second, we consider whether the irregularity was cumulative of other properly admitted evidence. Banfield argues that though the jury was aware of the no-contact order and that the police had been to Curtis's apartment in the past, "there was no other evidence to the effect [that he perpetrated] chronic domestic violence." Br. of Appellant at 18-19. To the extent that Curtis's testimony indicated that she had had previous interactions with Banfield, it was consistent with her testimony regarding the active no-contact order that had been admitted into evidence. The no-contact order reflected that the Kelso Municipal Court issued the order "to prevent possible recurrence of violence" and because it found that Banfield "ha[d] been charged with, arrested for, or convicted of a domestic violence offense, [and] that [Banfield] represents a credible threat to the physical safety of [Curtis]." CP, Pl's Ex. 1, PDF at 191. The no-contact order therefore provides some evidence of prior domestic violence. Because Curtis's testimony,

to some degree, was cumulative of other properly admitted evidence, this factor does not weigh in favor of a mistrial.

Third, we consider whether the irregularity could have been cured with an instruction. Banfield argues a jury instruction could not have cured the admission of the contested portion of Curtis's testimony. We disagree. A trial court has broad discretion to cure trial irregularities resulting from a witness's improper statements. *Gamble*, 168 Wn.2d at 177. The question is whether the improper statements, when "'viewed against the background of all the evidence,'" were so prejudicial that the defendant did not get a fair trial. *Id.* (quoting *State v. Thompson*, 90 Wn. App. 41, 47, 950 P.2d 977 (1998)). We presume that jurors follow the court's instructions. *State v. Weaver*, 198 Wn.2d 459, 467, 496 P.3d 1183 (2021).

Here, Curtis's testimony irregularity could have been cured with an instruction. Viewed against the background of all the evidence against Banfield, as discussed above, Curtis's statement was not so prejudicial that Banfield did not get a fair trial. Thus, this factor does not weigh in favor of a mistrial.

Given the facts of this case, Curtis's testimony irregularity did not cause prejudice to Banfield nor did it affect the jury's verdict. Furthermore, the irregularity could have been remedied with an instruction. Thus, we hold that the trial court did not err in denying Banfield's motion for mistrial based on Curtis's testimony.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Banfield argues that he received ineffective assistance of counsel because his counsel did not move to suppress evidence obtained from the warrantless search of his wallet and did not subject the State's case to meaningful adversarial testing. We disagree.

13

A.      *Legal Principles*

A criminal defendant has a right to effective assistance of counsel at every critical stage of the proceeding.  U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.  *United States v. Cronic*, 466 U.S. 648, 654, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

To prevail on a claim of ineffective assistance of counsel, Banfield must show both deficient performance and resulting prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Performance is deficient if it falls below an objective standard of reasonableness.  *State v. Bertrand*, 3 Wn. 3d 116, 128, 546 P.3d 1020 (2024).  We strongly presume that counsel's performance was effective.  *Id.* at 130.  To rebut this presumption, a defendant bears the burden of showing there was no possible legitimate trial tactic that would explain counsel's performance.  *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

To demonstrate prejudice, a defendant must show a reasonable probability that, absent the deficient performance, the outcome of the trial would have differed.  *Bertrand*, 3 Wn.3d at 129.  It is not enough to merely show that errors had some conceivable effect on the outcome of the proceeding.  *Strickland*, 466 U.S. at 693.  If a claim of ineffective assistance of counsel fails to support a finding of either deficiency or prejudice, it fails, and a court need not address both components of the inquiry or approach the inquiry in a particular order.  *Id*. at 697.

B.      *Motion to Suppress*

We begin by addressing the prejudice component of the *Strickland* test.  Banfield bears the burden of showing, based on the trial record, that the outcome of the trial would have differed but for counsel's deficient performance—not moving to suppress the warrantless search

of his wallet. *Bertrand*, 3 Wn.3d at 129. He has not made this showing because the State presented overwhelming evidence linking Banfield to the crimes charged, as discussed above. Even if Banfield's counsel successfully suppressed evidence obtained from the search of Banfield's wallet, Banfield cannot show that it would have changed the outcome of the trial.

Thus, we hold his ineffective assistance of counsel claims fails on the second prong of the *Strickland* test. In light of our determination, we need not address the deficient performance component of the *Strickland* test. *Strickland*, 466 U.S. at 697.

C.    *Meaningful Adversarial Testing*

Banfield argues his counsel failed to subject the State's case to meaningful adversarial testing by not cross-examining most of the State's witnesses. He further argues that he does not need to show prejudice because it is presumed under *Cronic*. We disagree.

In *Cronic*, the United States Supreme Court recognized a narrow exception to *Strickland's* holding that a defendant must show both deficient performance and resulting prejudice to prevail on an ineffective assistance of counsel claim. *State v. McCabe*, 25 Wn. App. 2d 456, 462, 523 P.3d 271 (2023), *review denied*, 1 Wn.3d 1014 (2023). *Cronic* acknowledged that a defendant need not make a specific showing of prejudice where there has been "a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659. This narrow exception applies when "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *McCabe*, 25 Wn. App. 2d at 462 (quoting *Cronic*, 466 U.S. at 659). In other words, this exception is limited to cases where defense counsel was absent or entirely uninvolved. *Id.* at 463.

Banfield contends that we should apply the exception in *Cronic*. For us to do so, Banfield's counsel must have been absent or entirely uninvolved, but Banfield makes no such claim. Moreover, his counsel clearly participated in the trial, even if not in a manner that was satisfactory to Banfield. Although Banfield's counsel cross-examined only one of the State's six witnesses and did not call its own witnesses, counsel's performance did not deprive Banfield entirely of a defense. Banfield's counsel was actively involved during the pretrial stage and at trial, responding to the State's motions in limine, arguing a defense motion in limine, and moving for a mistrial. Banfield's counsel held the State to its burden and focused the defense on whether the State proved the burglary charge. Banfield's counsel also appeared to make a strategic decision regarding whether to cross-examine several eyewitnesses, all of whom saw Banfield with Curtis or found Banfield at Curtis's residence on the date in question. Thus, we hold Banfield fails to demonstrate that he was denied the effective assistance of counsel within the meaning of *Cronic*. Thus, his claims of ineffective assistance of counsel fail.

## III. RIGHT TO A SPEEDY TRIAL

Banfield argues that the trial court violated his right to a speedy trial because of the 23-month delay to his trial. The State agrees that the delay in Banfield's trial was lengthy but denies that his rights were violated. We agree with the State that the delay was lengthy but disagree with Banfield that the trial court violated his speedy trial right.

A.     *Legal Principles*

The analysis for constitutional speedy trial rights under article I, section 22 is substantially the same as the analysis under the Sixth Amendment. *State v. Ollivier*, 178 Wn.2d

16

813, 826, 312 P.3d 1 (2013). We review de novo whether a defendant's constitutional right to a speedy trial has been violated. *Id*.

The courts and prosecutors have "the primary burden" to ensure that cases are brought to trial. *Barker v. Wingo*, 407 U.S. 514, 529, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Defendants have no duty to bring themselves to trial. *Id*. at 527.

We use the *Barker* balancing analysis to determine whether a defendant's constitutional right to a speedy trial was violated. *Ollivier*, 178 Wn.2d at 827. Under *Barker*, we consider nonexclusive factors, including the '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" *Id.* (alteration in original) (quoting *Barker*, 407 U.S. at 530). No one factor is sufficient or necessary to find a violation, but they assist in determining whether a defendant's right to a speedy trial has been violated. *Id*. That said, the focal point of the *Barker* analysis is the reason for the delay. *Id.* at 831.

The *Barker* balancing analysis is fact-specific and depends on the circumstances of the case. *Id.* at 827. When weighing the *Barker* factors, we must assess the conduct of both the State and the defendant. *Id.*

B.      *Barker Balancing Analysis*

        1. *Length of Delay*

Analysis of the length of delay involves a double inquiry. *Id.* To trigger the *Barker* analysis, the defendant must make a threshold showing that the window between when charges were filed and when trial began surpassed the ordinary interval for prosecution, crossing into presumptively prejudicial delay. *Id.* We then consider the degree to which the delay exceeded

17

the bare minimum needed to trigger the *Barker* analysis. *Id.* at 828. Put differently, the trigger for the *Barker* analysis and the first factor in that analysis is the length of the delay. *Id.*

In *Ollivier*, our Supreme Court noted that trial courts have generally found that delay is presumptively prejudicial when it approaches one year. *Id.* In that case, the State conceded that a 23-month delay was sufficient to trigger the *Barker* analysis. *Id.*

Banfield argues that this factor weighs in his favor because "the facts of the case were very straightforward and did not involve complex pretrial discovery." Br. of Appellant at 45. The State appears to agree that Banfield has made a threshold showing that the 23-month delay in his case was presumptively prejudicial and is sufficient to trigger the *Barker* analysis.

We agree with the State that the delay in Banfield's trial was lengthy. Here, the delay surpassed the ordinary interval for prosecution, even for an individual that was out of custody, and crossed into presumptive prejudicial delay. Accordingly, we conclude that the length of the delay weighs in favor of Banfield.

2. *Reason for Delay*

The second *Barker* factor is the reason for the delay. *Id.* at 827. This factor is the focal point of the *Barker* analysis. *Id.* at 831. The State argues that this factor should weigh in its favor because it is unreasonable to hold the State responsible for unforeseen acts of nature, such as the COVID-19 pandemic. Other than the pandemic, the State claims that Banfield's own actions were mostly responsible for the 23-month delay. We conclude that the reason for delay factor weighs against Banfield.

In general, the second *Barker* factor focuses on "whether the government or the criminal defendant is more to blame" for the delay. *Doggett v. United States*, 505 U.S. 647, 651, 112 S.

Ct. 2686, 120 L. Ed. 2d 520 (1992). We "look[] to each party's responsibility for the delay, and different weights are assigned to delay, primarily related to blameworthiness and the impact of the delay on defendant's right to a fair trial." *Ollivier*, 178 Wn.2d at 831.

The defendant is responsible for delay caused by defense counsel and this includes resulting delays from seeking continuances. *Id.* at 832. We weigh the State's deliberate delays heavily against it. *Id.* We weigh delay that is caused by the State's negligence or overcrowded courts against the State but to a lesser extent. *Id.*

Here, the State requested two continuances because of the unavailability of material witnesses, and the court granted them after finding good cause. Additionally, the court found good cause to continue the trial by a week because it did not have an available courtroom to hear Banfield's case. There is no evidence that the State deliberately delayed the trial to frustrate the defense. The State is responsible for the delays resulting from the continuances and court congestion and we weigh these to a lesser extent than we would any deliberate delays.

The Cowlitz County Superior Court and Washington Supreme Court issued multiple orders, which suspended trials for periods of time and necessitated COVID-19 related continuances. While this created a delay for both parties, neither party caused the COVID-19 pandemic nor the resulting suspension of trials. Therefore, we do not assign responsibility to either party for the delays resulting from those continuances.

Banfield's counsel requested two continuances, one due to his withdrawal based on a conflict of interest and one presumably due to his approved leave. The court determined there was good cause for both continuances. Next, Banfield failed to appear for trial in December

19

2021 due to health issues.  Additionally, Banfield failed to appear for a readiness hearing.

Banfield is responsible for those resulting delays.

Although the State shares responsibility for the 23-month delay, Banfield's conduct was

the more significant cause of the delay based on the number of delays attributed to Banfield and

his counsel.  Accordingly, we conclude that the reason for delay factor weighs more heavily

against Banfield.

        3.  *Assertion of Right to Speedy Trial*

The third *Barker* factor is whether the defendant asserted their right to a speedy trial.  *Id*.

at 827.  We find this factor weighs in Banfield's favor.

When analyzing the third Barker factor, we consider "whether and to what extent a

defendant demands a speedy trial."  *State v. Iniguez*, 167 Wn.2d 273, 294, 217 P.3d 768 (2009).

We objectively examine a defendant's assertion of their speedy trial right in light of their other

conduct.  *Id.* at 284.  We consider the frequency and force of a defendant's objections to further

delay.  *Id.* at 295.

Here, Banfield opposed several continuances.  When he objected, he clearly asserted his

speedy trial right.  Thus, we conclude that the assertion of the right to a speedy trial factor

weighs in favor of Banfield.

        4.  *Prejudice from Delay*

The fourth *Barker* factor is whether the delay prejudiced the defendant.  *Ollivier*, 178

Wn.2d at 827.  Banfield appears to argue that he may rely on a presumption of prejudice.  We

disagree.

Courts do not always presume prejudice. *Id.* at 840. Indeed, they generally have presumed prejudice where there is an extreme delay that has lasted at least five years. *See id.* at 842-43. "A defendant ordinarily must establish actual prejudice before a violation of the constitutional right to a speedy trial will be recognized." *Id.* at 840.

Courts consider an impairment of the defense to be the most serious form of prejudice, and we presume this prejudice intensifies over time. *State v. Nov*, 14 Wn. App. 2d 114, 134, 469 P.3d 352 (2020). A defendant need not make particularized showings of prejudice when a delay is sufficient in length such that a presumption of prejudice arises. *Id.* at 134-35. The State may rebut this presumption by showing that the delay did not impair the defense. *Id.* at 135.

Here, Banfield, who was out of custody, does not advance any particularized prejudice, such as an impairment to his ability to present a defense. While prejudice presumably intensifies over time, under these circumstances, the 23-month delay is not long enough to constitute extreme delay warranting the presumption of prejudice. Thus, we conclude that the prejudice from delay factor weighs heavily against Banfield.

5. *Balancing the Factors*

We must balance the *Barker* factors. *Ollivier*, 178 Wn.2d at 827. As discussed above, the reason for delay and prejudice from delay factors weigh heavily in favor of the State. The length of delay and assertion of the right to a speedy trial factors weigh in favor of Banfield.

Notably, the focus of the *Barker* analysis is the reason for the delay. Here, beyond the COVID-19 pandemic, the 23-month delay was more so due to Banfield's conduct than the State's conduct. Furthermore, the record does not show that the defense was impaired by the

21

delay, rebutting any presumption of prejudice to Banfield. These factors outweigh the length of delay and assertion of the right to a speedy trial.

Considering all four *Barker* factors, we conclude that the balancing analysis weighs in favor of the State. Accordingly, we hold that the trial court did not violate Banfield's right to a speedy trial under the United States and Washington Constitutions.

## IV. LEGAL FINANCIAL OBLIGATIONS

Banfield argues his $500 VPA and $100 DVA fees should be stricken. We remand to the trial court to consider whether to impose the VPA fee and to strike the DVA fee.

Amended RCW 7.68.035(4) requires that no VPA fee be imposed if the trial court finds at the time of sentencing that the defendant is indigent as defined in RCW 10.01.160(3). Amended RCW 7.68.035(4) applies to Banfield because this case is on direct appeal. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). At sentencing, the trial court stated that it would "impose the mandatory minimum financial obligations, [and] waive anything that[] [was] not mandatory." RP at 388. It did not make an indigency determination. Because the trial court has not made the specific indigency finding that is necessary under RCW 10.01.160(3) and this case is on direct appeal, we remand to the trial court to evaluate indigency under the statutory definition and consider whether to impose the VPA fee.

RCW 10.99.080(1) provides in part that a trial court "*may* impose a penalty of one hundred dollars, plus an additional fifteen dollars on any adult offender convicted of a crime involving domestic violence" (emphasis added). At sentencing, the trial court indicated that it was going to impose only mandatory legal financial obligations. Thus, we remand to the trial court to strike the DVA fee.

22

No. 58510-3-II

CONCLUSION

We hold (1) the trial court did not err in denying Banfield's motion for mistrial based on Curtis's testimony, (2) Banfield fails to demonstrate that he was denied the effective assistance of counsel, and (3) the trial court did not violate Banfield's right to a speedy trial under the United States and Washington Constitutions.

Accordingly, we affirm Banfield's conviction, but remand to the trial court to consider whether to impose the VPA fee under RCW 10.01.160(3) and to strike the DVA fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Veljacic, A.C.J.

Price, J.

23